**MURRAY E. GILDERSLEEVE LOGGING COMPANY, and Alaska Pacific Assurance Company, Appellants,**

v.

**NORTHERN TIMBER CORPORATION, Appellee.**

No. 6519.

Supreme Court of Alaska.

Sept. 16, 1983.

Mary E. Guss, Clifford H. Smith, Ziegler, Cloudy, Smith, King & Brown, Ketchikan, for appellants.

Michael M. Holmes, Faulkner, Banfield, Doogan & Holmes, Juneau, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

OPINION

COMPTON, Justice.

This is an appeal from a jury verdict rendered in favor of Northern Timber Corporation ("NTC") on a breach of contract suit against Murray E. Gildersleeve Logging Co. ("MEG"). The jury found MEG liable for damages totalling $213,640.51. Interest, costs and attorney's fees were added. This appeal concerns only the jury instructions given at trial. For the reasons set forth below, we find that the jury was correctly instructed as to all issues except the measure of damages. On remand, the jury must be instructed on the proper measure of damages and permitted to decide the factual disputes surrounding the damages issue.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 20, 1979, MEG entered into a logging agreement with NTC to log 4.5 million board feet (MMBF) of timber at Shakan Bay on Kosciusko Island near Ketchikan, Alaska. NTC had obtained the rights to log timber located on two parcels of private property at Shakan Bay. Wedged in between these two parcels were fourteen acres of land owned by the United States Forest Service.

The crux of this dispute concerns the Forest Service's decision, in August 1979, not to make a "green sheet sale" of the Forest Service parcel to MEG. A green sheet sale refers to a negotiated sale of small parcels of Forest Service timber having an appraised value of less than $2,000.00. Green sheeting is quicker than the usual process of advertisement and bidding, and by Forest Service regulations, may only be used on small parcels in which only one party is interested. MEG contended at trial that the Forest Service's decision not to green sheet the Forest Service parcel was a result of NTC's interference. NTC answered this argument by saying that it did not make any objections to the green sheeting, and that the Forest Service's decision was mandated in any event by government regulations respecting timber sales.

Since the Forest Service parcel was not quickly sold to MEG as the company had anticipated, MEG was not able to harvest the Forest Service timber, although the company had been given permission to build access roads through that parcel and truck logs from the other properties through it. MEG believed that without the revenue from the timber on the Forest Service parcel and without the easier access through the fully cleared property, it was impossible to fulfill the terms of the logging agreement. As a result, MEG abandoned the Shakan Bay operation in November of 1979, after having produced 1.5 MMBF of export timber for NTC.

NTC moved in to complete the logging itself in the spring of 1980. After advertisements and bidding, the Forest Service parcel was sold to NTC, which logged a small portion of it and extended the access roads begun by MEG through the rest.

Using the extended access roads, NTC logged 2.2 MMBF of export timber, which was enough to satisfy NTC's buyer, the Three M Co., Ltd. (3–M). 3–M, however, was not satisfied with the quality of the logs rafted by MEG, and assessed a penalty on NTC in the form of a fifteen percent discount on the price it paid for those logs. This penalty amounted to approximately $26,000.00.

After completing the work at Shakan Bay, NTC sued MEG for the excess cost of logging the 2.2 MMBF in 1980. In its complaint against MEG, NTC also demanded repayment of the unpaid portion of a $125,-000.00 advance which NTC had made to MEG at the beginning of the 1979 season, and an additional $26,211.50 for breach of the log specification provisions of the logging agreement, based on the penalty assessed by 3–M.

MEG responded to NTC's suit by filing an answer and a counterclaim for damages in excess of $100,000.00. NTC moved for partial summary judgment, which was denied. A jury trial in superior court followed, in which the jury returned a verdict in favor of NTC, awarding it all the damages it had requested. MEG moved for a

new trial and the trial court denied the motion. This appeal followed.

## II. IMPOSSIBILITY OF PERFORMANCE

 MEG's primary contention on appeal is that the superior court erred in its disposition of the issue of impossibility. Impossibility of performance is recognized as a valid defense to an action for breach of contract when the promissor's performance becomes commercially impracticable as a result of the frustration of a mutual expectation of the contracting parties. *Northern Corp. v. Chugach Electric Association,* 518 P.2d 76, 80–82 (Alaska 1974). Commercial impracticability is demonstrated when performance " 'can only be done at an excessive and unreasonable cost.' " *Id.* at 81, *quoting Natus v. United States,* 371 F.2d 450, 456 (Ct.Cl.1967). While an explicit agreement is not necessary to establish a mutual expectation, there must be an assumption on both sides that an event will occur for its non-occurrence to excuse a breach. *Northern Corp. v. Chugach Electric Association,* 518 P.2d at 81, 82. *See also* Restatement (Second) of Contracts § 261 comment b (1979).

 The superior court could find no credible evidence to support MEG's claim that the Forest Service's decision made the performance of the logging agreement commercially impracticable. The court ruled as a matter of law that the performance was not rendered impossible by the Forest Service's decision. We agree.

There was no showing by MEG that the cost of performance without the use of the Forest Service parcel would have been much greater than the cost of performance with it. As the court below noted:

That is probably the critical factor is what's the difference. The closest I could get to anything on it was when Mrs. Gildersleeve testified that she was concerned about making it to begin with, and that the sale would have helped with the cost on that road construction. And

that didn't sound like much of a difference.

In addition, the testimony of witnesses for NTC and the language of the logging agreement itself suggest that the green sheet sale was not a mutual assumption of the parties. Paragraph 5 of the agreement states:

> In the event that MEG obtains the right to cut timber on Forest Service property or private property adjoining the property described in paragraph 1 above, MEG shall provide NTC with timber cruises on said Forest Service property . . . .

(Emphasis added.)

None of the prerequisites for a defense of impossibility are present here. Performance was not rendered impracticable, or even particularly difficult, by the Forest Service's decision, and there was no mutual expectation by MEG and NTC that the Forest Service parcel would be green sheeted to MEG. Accordingly, the superior court instructed the jury as follows:

> It is, therefore, up to the court, and not to the jury, to decide whether the Forest Service's decision to sell the timber on the fourteen-acre tract by competitive bid, rather than by negotiation to MEG frustrated the contract between MEG and NTC. The issue of whether the plaintiff unjustly and effectively prevented MEG from performing the contract is a different question, and it is for the jury to decide by the preponderance of the evidence.

These peremptory instructions were properly given.[1]

MEG contends that because these instructions did not permit the jury to decide the entire question of impossibility, the court erred in giving them. MEG, however, misapprehends the distinction between impossibility of performance and interference with performance. The superior court carefully distinguished between these two defenses, explaining that the question of whether the Forest Service's decision rendered MEG's performance impossible was a matter of law for the court to decide, while the question of whether NTC interfered with MEG's performance was a matter of fact for the jury to decide.[2] Interference need not make performance impossible or impracticable in the substantive legal sense in order for it to provide an excuse for nonperformance. If the jury found that NTC had interfered in any way with the contract so as to prevent MEG from performing, it could have rendered a verdict in favor of MEG, despite the fact that the jury was not permitted to decide whether the Forest Service's action made performance impossible. As the trial court pointed out, "the interference or the failure to cooperate, those are related. And they are not part of the impracticability. They could be related to it as a factual matter, but legally they are not related." We agree with the trial court that there was insufficient evidence to send to the jury the question of whether the Forest Service decision rendered performance impossible. Accordingly, we need not decide whether the question of impossibility is one of law or fact.

### III. SUFFICIENCY OF EVIDENCE

It remained for the jury to decide whether NTC had interfered with the contract, but the superior court limited the scope of the jury's inquiry. MEG asserted that NTC interfered with the logging agreement by

---

1. Alaska Pattern Jury Instructions 24.08B (Affirmative Defense, Frustration of Purpose), and 24.08C, (Affirmative Defense, Commercial Impracticability) provide three options for a trial court judge in giving instructions on the impossibility defense. The judge may:
 (1) do the factfinding,
 (2) issue special interrogatories to the jury,
 (3) issue a peremptory instruction.

2. The court apparently based its distinction on a line of California cases which state that

whether performance is impossible is a conclusion of law to be drawn by the judge. *See Glen Falls Indemnity Co. v. Perscallo,* 96 Cal.App.2d 799, 216 P.2d 567 (1950); *Mitchell v. Ceazan Tires,* 25 Cal.2d 45, 153 P.2d 53 (1944). *Cf. Turner v. Turner,* 186 Ga. 223, 197 S.E. 771 (1938) and *McDonough v. Almy,* 218 Mass. 409, 105 N.E. 1012 (1914) which state that whether interference by the promisee renders performance impossible is a question of fact to be decided by the jury.

influencing the log scaler at Shakan Bay and by permitting the on-site NTC representatives to modify the agreement, but the court did not agree.

The court instructed the jury that the log scaler who worked at the Shakan Bay site was an employee of an independent contractor, and that NTC had no control over him. The court evidently based its instructions on the contract between NTC and the log scaling cooperative, which states that the cooperative had exclusive control and supervision of the scaler, and on the testimony of NTC and the scaler himself, which corroborated the contractual evidence. The court also instructed the jury that "there was only one change in the log specifications," which change was "by mutual agreement of the parties in [an amendment to] the logging agreement." Thus, the court impliedly rejected MEG's claim that NTC's on-site representatives Laura and Chris Hicks modified the logging agreement. Laura and Chris Hicks informed the loggers of the specifications in the logging agreement, and tried to see that those specifications were met, but there was no evidence produced to show that they modified the contract in any way. MEG contends that the superior court erred in giving both of these instructions.

 The instructions were given because the superior court apparently believed the evidence presented at trial was insufficient to raise an issue of fact. Where the court decides there is insufficient evidence to raise a question of fact, it may remove that factual issue from consideration by the jury. *Taylor v. Interior Enterprises, Inc.,* 471 P.2d 405 (Alaska 1970). This practice has been formalized in Alaska's Civil Rule 50 concerning directed verdicts. We have held that a directed verdict will be granted when reasonable jurors could not differ in their resolution of a disputed issue of fact. *Mullen v. Christiansen,* 642 P.2d 1345, 1348

(Alaska 1982); *Beaumaster v. Crandall,* 576 P.2d 988, 994 (Alaska 1978); *Martinez v. Bullock,* 535 P.2d 1200, 1203 (Alaska 1975). In ruling upon a motion for a directed verdict, the court is required to cast all factual inferences in favor of the party opposing the motion. *Mullen,* 642 P.2d at 1348; *Levar v. Elkins,* 604 P.2d 602, 603–04 (Alaska 1980); *Alyeska Pipeline Service Co. v. Aurora Air Service, Inc.,* 604 P.2d 1090, 1094 (Alaska 1979). We hold that a directed verdict on the issue of interference with the log scaler and on-site modification of the contract by the Hickses was appropriate based on the evidence presented before the superior court in this case.[3]

## IV. DAMAGES

### A. *Measure of Damages*

The jury found that NTC had not interfered with the contract, and awarded expectation damages to NTC based on the extra costs NTC incurred by having to move into Shakan Bay and do the logging itself after MEG abandoned the site in 1979. This court has held that one "purpose of awarding damages for a breach of contract is to put the injured party in as good a position as that party would have been had the contract been fully performed." *Guard v. P & R Enterprises, Inc.,* 631 P.2d 1068, 1071 (Alaska 1981). *See also* Restatement (Second) of Contracts § 344(a) (1979). The formula for expectation damages devised by NTC compared NTC's average costs of production during MEG's performance in 1979 with NTC's own average costs of production when NTC took over the site in 1980. NTC calculated that the production costs per thousand board feet were $317.55 in 1979 and rose to $379.61 in 1980. The jury was told that this cost differential was the sole measure of NTC's expectation interest, and that in order to give NTC the benefit of its bargain, it was entitled to the difference in costs.[4]

**3.** We note that the trial court did not apply the directed verdict standard set forth above, but stated that "preponderance of the evidence is the rule here." We express no opinion as to whether this was the correct standard because

we conclude that the stricter Civil Rule 50 requirements were satisfied.

**4.** The jury was instructed as follows in Instruction No. 23:

In Instruction No. 23, the jury was informed that the difference in profits was "reflected by the difference in costs," although the two measures of damages are not the same. While the wronged party in a breach of contract suit is entitled to the benefit of his bargain, he is not entitled to any more than his actual loss. *Illinois Central Railroad Co. v. Crail,* 281 U.S. 57, 63–64, 50 S.Ct. 180, 181, 74 L.Ed. 699, 702–03 (1930); *Hoosier Insurance Co., Inc. v. Mangino,* 419 N.E.2d 978, 980–81 (Ill.App.1981); Restatement (Second) of Contracts § 347 comment e (1979). The court below cited the Restatement doctrine on actual loss, but Instruction No. 23's measure of damages does not account for the profits earned by NTC in 1980. MEG objected at trial that the instruction did not allow the jury to consider whether NTC's 1980 profits might partially offset whatever loss NTC may have suffered as a result of MEG's abandonment of the Shakan Bay operation.

### B. *MEG's Objections*

MEG has three specific objections to the jury instructions on damages. First, MEG contends that because NTC's 1980 cost per thousand reflects the cost of producing domestic logs at Shakan Bay as well as export logs, the damages figure misrepresents the expense incurred by NTC in completing MEG's work. The 1979 figures do not include the costs of domestic timber because the logging agreement signed by MEG called for only export timber. Therefore, MEG argues, it should not have to bear the cost of NTC's domestic logging.

Second, in 1979, NTC paid a ten percent commission to Pacific Timber Products, a company which acted as a broker between NTC and 3–M. In 1980, when NTC took over the logging operation, it did not pay a sales commission. MEG contends that this was an avoided cost, and that the jury should have been instructed to deduct the amount of the sales commission from any damages awarded to NTC.

Finally, MEG argues that the measure of damages should be the difference in profits, not the difference in costs. According to MEG, NTC made $118.67 per thousand board feet ("MBF") in 1979 and only $98.64 per MBF in 1980, so that the effect of the loss of MEG's services may be calculated by multiplying the difference in profits ($20.03) by the number of board feet of export timber NTC produced in 1980 (2.183 MMBF).[5]

---

If you find that Murray E. Gildersleeve Logging Company breached its contract with Northern Timber Corporation, then Northern Timber Corporation's "expectation" damages in relation to the timber cut by Northern Timber Corporation in 1980 are as follows: (1) Northern Timber corporation should be awarded damages equal to the difference between its actual costs of harvesting, logging, and rafting the remaining timber, and the contract price it would have paid if Murray E. Gildersleeve Logging Company had completed this work by December 31, 1979. Northern Timber Corporation's costs include its expenses in moving its equipment and crew in and out of the logging area so that it could perform this work. (2) The difference in costs as reflected in any profit on the timber earned by NTC is a minus, and therefore, you should not reduce the damages against MEG by any profits. In order to ensure that NTC receives the benefit of its bargain, it is entitled to the difference in profits which it would have had if the contract had been performed as the parties agreed. In this case, that difference is reflected by the difference in costs to NTC for the timber it sold.

5. Both MEG and NTC base their calculations on the following data (all figures are dollars per thousand board feet):

| | 1979 MEG Operation | 1980 NTC Operation |
|---|---|---|
| Sales: | | |
| Export logs | $436.22 | $478.25 |
| Domestic logs | – – – | 152.98 |
| USFS logs | – – – | 217.24 |
| All logs | 436.22 | 419.09 |
| Cost of logs | 317.55 | 379.61 |
| Profit before Sales Commission | | |
| Export logs | 118.67 | 98.64 |
| All logs | 118.67 | 39.48 |
| Sales Commission | 43.60 | – – – |
| Net Profit: | | |
| Export logs | 75.06 | 98.64 |
| All logs | 75.06 | 39.48 |

The sales figure for all 1980 logs is not an average of their sales prices alone because different numbers of each type of log were produced.

■ MEG charges that it was not reasonable and foreseeable that NTC would log domestic timber in 1980 in order to mitigate its losses. MEG does not squarely address the propriety of the specific jury instruction concerning mitigation, however, which appears to dispose of the issue. The jury was correctly instructed about the domestic timber in Instruction No. 26:

> If you find that logging and selling that timber was done in an effort to minimize losses or damages, you should include them in assessing NTC's damages. If you find that logging and selling that timber was not done to minimize losses or damages but rather as a separate operation, you should not include them in assessing NTC's damages.

Instruction No. 26 by itself would have allowed the jury to decide whether the mitigation was reasonable, which is normally a question of fact. *West v. Whitney-Fidalgo Seafoods, Inc.*, 628 P.2d 10, 18 (Alaska 1981). But the jury's discretion in this matter was undercut by the court's further instruction regarding the measure of damages.

### C. *Instructions on Measure of Damages*

MEG argued at trial for an instruction that NTC's damages should be reduced by "an amount equal to all costs avoided by and additional profits received by NTC as a result of NTC producing export timber in 1980, rather than MEG producing it in 1979." This instruction was not given. Instead, the jury was told in Instruction No. 23:

> (2) The difference in costs as reflected in any profit on the timber earned by NTC is a minus, and therefore, you should not reduce the damages against MEG by any profits. In order to ensure that NTC receives the benefit of its bargain, it is entitled to the difference in profits which it would have had if the contract had been performed as the parties agreed. In this case, that difference is reflected by the difference in costs to NTC for the timber it sold.

Part (2) of Instruction No. 23, although somewhat unclear, apparently indicates the court's belief that NTC made less profit in 1980 than it did in 1979, and therefore the jury should not reduce the damages, as measured solely by differences in costs, by any additional 1980 profits. The court stated as much when it considered counsels' objections to the proposed jury instructions: "THE COURT: My understanding is that NTC made less money in 1980 than it would have made if the contract had been performed in 1979." This understanding depends on a number of assumptions, one of which was apparently that the logging of domestic timber was an effort to minimize losses. Out of the presence of the jury, the court observed that "the sale of domestic logs and the Forest Service transaction were an effort to cut losses, and they've got to be included in, too. They may have added to it, but it was a bona fide effort to reduce unit costs."

In its computation of 1979 profits, MEG omits the sales commission paid to Pacific Timber Products. MEG also uses the inaccurate figure of $478.25 as the 1980 sales price for export logs. The correct price is $487.25 per MBF. NTC's accountant apparently transposed two digits in dividing the number of export logs produced in 1980 by the amount paid for them. Using the corrected figure, the 1980 profit by MEG's reckoning should be $107.64 per MBF, not $98.64. The net profit for 1980 export logs is reduced if the cost of producing non-export logs is eliminated from the profit equation, but it is still greater in 1980 than in 1979. The cost of producing export logs alone in 1980 was approximately $398.64 per MBF, so the profit on export logs was $88.61 per MBF. Had the jury determined that the logging of domestic timber was not an effort to minimize losses, they might have concluded that NTC suffered no loss in profits from MEG's breach of contract. As discussed below, however, Instruction No. 23 prevented the jury from deciding the issue of mitigation, and locked them into a determination of damages based on costs alone. If logging domestic timber was an effort to mitigate damages then the proper measure of recovery is (1) the difference between 1979 and 1980 profits on expert log production plus (2) the additional cost of production of the domestic logs (that is costs in addition to those which would have been incurred in any event had NTC only produced export logs) less revenue received from the sale of the domestic logs.

If the sale of domestic logs is *not* considered an effort to minimize losses, then NTC's own exhibit shows that the net profit from the sale of export logs alone was greater in 1980 than it was in 1979. (*See* note 5 *supra*). Thus, although Instruction No. 26 appeared to leave the mitigation question up to the jury, the assumptions made in Instruction No. 23 removed the issue from their consideration. Instruction No. 23 forced the jury to evaluate damages based on the cost differential between 1979 and 1980, and forced them to assume that domestic timber was logged in an effort to minimize losses. Since the determination of whether mitigation is reasonable or not is normally an issue of fact for the jury to decide, *West v. Whitney-Fadalgo Seafoods, Inc.*, 628 P.2d at 18, this instruction usurped the jury's fact-finding authority and is error.

### D. *Other Damages Instructions*

Apart from this error, the jury instructions regarding damages were correct. In particular, the court did not err in refusing to tell the jury that the sales commission paid to Pacific Timber Products was a "cost avoided" in 1980. The jury was instructed to use a cost differential method of measuring damages, and the sales commission had no effect on the cost of logs produced by MEG in 1979. It would therefore have been incorrect and misleading to tell the jury to deduct the sales commission from the award of damages.

On remand, however, the jury should be instructed to compute damages by the more accurate and equitable method of profit differentials. Using this method, the absence of the sales commission in 1980 will be relevant. NTC's profits were reduced in 1979 by the cost of the sales commission, and because NTC did not pay the commission in 1980, its 1980 profits were correspondingly greater. If the jury on remand finds that the logging of domestic timber was not done to minimize losses, then they must look at the net profit figures on export logs alone. They may conclude that NTC made more money from export logs in 1980 than it did in 1979 (*See* note 5 *supra*). Such a conclusion would be based, in part, on the "cost" of the sales commission.

Regardless of how damages are computed, the penalty assessed by 3–M for defective and substandard logs is an extra cost associated with MEG's log production. Regarding this penalty, the jury was instructed as follows: "If you find that the penalties levied by 3M Co., Ltd., against NTC resulted from MEG's failure to meet quality standards, the penalties should also be included [in the damage figure]." MEG did not dispute that it failed to meet certain quality standards set out in the agreement, but argued that this instruction was erroneous because the penalty was not a foreseeable result of the breach of the logging agreement. This argument is untenable. A producer of defective goods has reason to foresee that when the buyer of those goods loses money as a result of the defects, the producer will be liable for the loss. *See* Restatement (Second) of Contracts § 351 (1979); UCC § 2–714 (1972). The damages available in a breach of contract case are limited to those expenses which are the natural consequence of the breach. *Arctic Contractors, Inc. v. State*, 564 P.2d 30, 44–45 (Alaska 1977). MEG could have foreseen that if it did not meet the standards outlined in the agreement, a natural consequence would be that it would not be paid. In other words, MEG could have foreseen a one hundred percent penalty for defective logs. The fifteen percent penalty actually levied was not unforeseeable and was, under the circumstances, generous.[6] The jury instruction on the 3–M penalty was therefore correct.

### E. *Conclusion*

The error in Instruction No. 23 requires a remand of this case for a determination of damages. Instruction No. 23 states a measure of damages which incorrectly precludes the jury from making their own determination of factual issues. Fur-

---

**6.** Mr. Hidaka, the 3–M representative, thought that the penalty should have been thirty per- cent.

thermore, the instruction presumes that NTC's expectation interest may be measured only by cost differentials, while the evidence shows that a measure of damages based on diminution of profits would also give NTC the benefit of its bargain, and at less cost to MEG. Where there are alternative methods of determining the amount of damages, the method which is least expensive to the wrong-doer should be adopted. *A.A. Baxter Corp. v. Colt Industries, Inc.,* 10 Cal.App.3d 144, 88 Cal.Rptr. 842, 852 (1970); *see also* 25 C.J.S. Damages § 72 (1966).

On remand the court should instruct the jury to use the difference in profits as a measure of NTC's expectation interest. Although MEG did not suggest this alternative in the court below, its objections to the proffered instructions on damages were sufficient to put the court and opposing counsel on notice as to defects in the instruction, as required by the Alaska Rules of Civil Procedure.[7] *Alaska International Industries, Inc. v. Musarra,* 602 P.2d 1240 (Alaska 1970).

## V. RELATIONSHIP BETWEEN MEG AND ALPAC

Before trial began, MEG argued that the jury should be fully informed about the relationship between the Alaska Pacific Assurance Company ("ALPAC") and MEG. ALPAC posted a performance bond of $100,000.00 to assure NTC of MEG's performance of the logging agreement, but MEG was required to indemnify ALPAC for this amount if the logging agreement was breached. ALPAC was named as a defendant only because in attempting to recover on a performance bond, the obligee (in this case NTC) has the option of suing the surety along with the principal. *Fountain Sand & Gravel Co. v. Chilton Construc-*tion Co., 40 Colo.App. 363, 578 P.2d 664, 665 (1978); *Thompson v. Maloney,* 267 So.2d 378 (Fla.App.1972).

The jury knew about the performance bond because it was admitted into evidence as part of the agreement between MEG and NTC, but the court ruled that the indemnity agreement, and any testimony concerning it, was irrelevant and therefore inadmissible. Evidence as to insurance is traditionally excluded from liability trials in Alaska. *Poulin v. Zartman,* 548 P.2d 1299 (Alaska 1976). NTC argued, and the court apparently agreed, that the existence of an indemnity agreement had no bearing on the contested issues of MEG's liability or the proper amount of damages. Evidence which is not relevant is not admissible. Alaska R. Evid. 402. Relevant evidence is defined as evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Alaska R.Evid. 401. The indemnity agreement did not prove or disprove any facts relating to NTC's breach of contract claim or MEG's impossibility defense and the court properly excluded it as irrelevant.

MEG does not directly challenge the finding of irrelevance, but instead asserts that the jury was prejudiced because ALPAC was a named party in the suit and present through counsel throughout the trial, which effectively put the jury on notice that MEG was insured.[8] In *Bertram v. Harris,* 423 P.2d 909 (Alaska 1967), we found that voir dire questions to jury members concerning their stockholdings in insurance companies "may have conveyed to the jury the impression that an insurance company would be required to pay any judgment recovered against the appellee." *Id.*

---

**7.** Alaska R.Civ.P. 51(a) provides in part:

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

After objecting to the instructions on cost differential measure of damages suggested by NTC, and offering amendments of its own to correct those instructions, MEG may have been lulled into a false sense of security by the judge's statements that "I want to instruct them in terms of the losses, the difference between the profit that would have been made and whatever money was made on the operation in 1980." Instruction No. 23, however, does not clearly make this comparison.

**8.** Where insurance information is injected into a trial, it has been held to be error to admit evidence explaining that there is *not* insurance.

at 918–19. Although this impression may have prejudiced the jury, we held in *Bertram* that any mistaken assumptions on this score were cured by an instruction that the jury was not to be concerned with insurance. *Id.*[9]

██ Similar instructions were given to the jurors in this case. Before trial began, the jury was told that ALPAC was "essentially a nominal party" to the suit. After the trial ended, the jury was given Instruction No. 35, which stated that "[t]he fact that there is an insurance company as a party to this lawsuit, and the fact that there is a performance bond should not influence your decision upon any issue in this case. It would be improper for you to give it any consideration." MEG did not object to this instruction. We hold that Instruction No. 35 cured whatever prejudice may have been caused by the admission of the performance bond into evidence and the presence of ALPAC as a defendant.

## VI. CONCLUSION

For the reasons stated above, we find that the superior court did not err in its disposition of the impossibility defense. Nor can we find any error in the lower court's determination that several claims raised by MEG were insufficiently supported by evidence to present triable issues of fact. The superior court's sole error was in instructing the jury on the measure of damages. By requiring the jury to compute damages on the assumption that NTC logged domestic timber in order to mitigate its losses, the court precluded the jury from considering a factual issue. On remand, the jury must be allowed to decide whether the domestic timber was logged in an effort to avoid losses. If it finds that domestic logging was an effort at mitigation, then it must measure the NTC's damages by a comparison between the profit earned on export log production in 1980 with the profit earned on export log production in 1979, plus the added cost of domestic log production in 1980 less revenues received therefrom.

AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

---

*Trout v. Talerico,* 237 Iowa 285, 21 N.W.2d 672 (1946); *Avent v. Tucker,* 188 Miss. 207, 194 So. 596 (1940); *Davis v. Underdahl,* 140 Or. 242, 13 P.2d 362 (1932). Other courts have reached opposite conclusions, *viz. Smith v. Raup,* 296 Ill.App. 171, 15 N.E.2d 936 (1938), but the general rule appears to be that evidence of no insurance will not be admitted absent unusual circumstances. *See generally* Annot., 4 A.L. R.2d 761, § 4 (1949). None of these cases, however, involve a named insurance company as a defendant. If an insurance company is named in the suit, several courts have held that it may still be improper and prejudicial to discuss the matter of insurance. *Oklahoma Transp. Co. v. Claiborn,* 434 P.2d 299 (Okl. 1967); *Kasan v. Liberty Mut. Ins. Co.,* 554 P.2d 113, 116 (Okl.App.1976); *Pecor v. Home Indem. Co.,* 234 Wis. 407, 291 N.W. 313 (1940).

Furthermore, although ALPAC is a named defendant, the ALPAC document admitted into evidence was not an insurance policy. It was a performance bond. The bond was attached to a folder that identified MEG as the "Insured," but the folder appears to be a standard item of ALPAC stationery. The bond attached to the folder was clearly headed "Performance Bond," and it did not state that MEG was insured.

**9.** The full text of the instruction in *Bertram v. Harris* was as follows:

> You are hereby instructed that in this case neither court nor jury may be concerned with insurance. You should not even discuss the subject in arriving at your verdict. You may not presume that the Defendant carries such insurance or that he should carry it. Your verdict must be based solely on the evidence in the case and the law as given in these instructions, without any regard whatsoever to the existence or non-existence of insurance.

423 P.2d at 918 n. 21.

Normally, in order to constitute error, the subject of insurance must be prejudicial. *Peters v. Benson,* 425 P.2d 149, 153 (Alaska 1967). Since the damages awarded here were justified by the measure of damages suggested by the court, MEG is forced to rely on the argument that the presence of ALPAC probably caused the jury to make a higher damages award than they might have done had they not known there was a performance bond. As MEG admits, though, without a discussion with the jury it cannot prove that the presence of ALPAC and the performance bond was prejudicial.