**LOYAL ORDER OF MOOSE, LODGE 1392, an Alaska nonprofit Corporation, Appellant,**

v.

**INTERNATIONAL FIDELITY INSURANCE CO., Appellee.**

No. S–2874.

Supreme Court of Alaska.

Aug. 17, 1990.

Gail M. Ballou, Fairbanks, for appellant.

William R. Satterberg, Jr., Fairbanks, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

The Moose Lodge ("Lodge") appeals the superior court's grants of summary judgment and attorney's fees to International Fidelity Insurance ("IFI") on the Lodge's tort claim of bad faith inaction by IFI as surety on performance and payment bonds covering a construction contract between Darling Enterprises ("Darling"), as princi-

pal, and the Lodge, as obligee.[1] We reverse.

## I. FACTS.

In May 1983 the Moose Lodge accepted Darling Enterprises' proposal for the "[t]urnkey construction" of a new facility in Fairbanks. The price was $559,500. Pursuant to the parties' contract, for included additional consideration, Darling obtained performance and payment bonds from IFI naming Moose Lodge as "obligee."

The contract provided, *inter alia,* that "the entire construction shall be done ... to the complete satisfaction" of the Lodge; that such construction would be "subject to inspection at all times and approval by any duly authorized agent for the owner and in accordance with the laws of the State of Alaska and local city ordinances"; and that "all ... materials shall be furnished ... and all ... labor shall be done and performed, in every respect, to the satisfaction of [the Lodge] on or before September 15, 1983, or within 120 calendar days." Liquidated damages would accrue at $150 per day after September 15, and $300 per day after October 1, 1983. Darling accepted "the prices set forth in the proposal as full compensation for ... all the materials and labor which may be required ... in the prosecution and completion of the whole work." [2] Specifically, the contract provided that

no claim for additional work or materials, not specifically herein provided, done or furnished by the CONTRACTOR, will be allowed by the OWNER[,] nor shall the CONTRACTOR do any work or furnish any material not ordered in writing by the OWNER.... And such work or materials which may be done or furnished by the CONTRACTOR without order first being given shall be at the said contractor[']s own risk, cost and expense and he hereby covenants and agrees that without such written order he shall make no claim for compensation for work or materials so done or furnished.

A Contract Addendum clarified that "both the Governor and Secretary of the Moose Lodge are the only signatures that can authorize a change order and must be signed by them both to be in effect." The contract further required that:

all disputed questions of fact which may arise from or relative to the performance or nonperformance of, or compliance or non-compliance with any of the terms or provisions of this agreement by either of the parties hereto, or to the amount of loss or damages suffered by either ... by reason of the non-performance of, or compliance or non-compliance with any of the terms or provisions of this agreement ... shall be referred to an impartial arbitration board. The board shall consist of three impartial members unrelated to the OWNER, CONTRACTOR, or members thereof for determination, and the decision by the board shall be final, binding, and conclusive upon all parties hereto.... [T]he referring of all such questions to the board and the determination thereof by them shall be a condition precedent to the bringing or filing of any ... court proceeding involving the determination of any such question.

The performance and payment bonds each incorporated the contract by refer-

---

1. The Lodge specifies error in
 (a) the superior court's determination that no material facts were in dispute in regard to the Lodge's bad faith tort claim against IFI and that IFI was entitled to summary judgment on this claim;
 (b) the superior court's denial of the Lodge's motion to amend its complaint to include allegations concerning IFI's breach of its payment bond;
 (c) the superior court's requirement that the Lodge first arbitrate its contract-based claims against IFI arising out of the performance bond;

 (d) the superior court's refusal to allow the Lodge discovery of IFI's loss reserves in regard to the Darling–Lodge construction project;
 (e) the superior court's Civil Rule 54(b) certification of the summary judgment granted to IFI on the Lodge's bad faith claim, and that court's award of attorney's fees to IFI on this judgment.

2. Completion would be "determined by a Certificate of Occupancy issued by the City of Fairbanks."

ence. The performance bond further provided that:

> Whenever Contractor shall be, and declared by Owner to be in default under the Contract, the Owner having performed Owner's obligations thereunder, the Surety may promptly remedy the default or shall promptly
>
> 1) Complete the Contract in accordance with its terms and conditions, or
>
> 2) Obtain a bid or bids for completing the Contract in accordance with its terms and conditions, and upon such determination by Surety of the lowest responsible bidder, or, if the Owner elects, upon determination by the Owner and the Surety jointly of the lowest responsible bidder, arrange for a contract between such bidder and Owner, and make available as Work progresses ... sufficient balance of the contract price, but not exceeding, including other costs and damages for which the Surety may be liable hereunder, [$559,500.00].[3]

The payment bond provided that Darling and IFI

> jointly and severally agree with [the Lodge] that every claimant [subcontractor] ... who has not been paid in full ... within ninety (90) days after the date of such claimant's ... labor was done or performed, or materials were furnished ..., may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due ..., and have execution thereon.

The payment bond further required each claimant to file any "suit or action" within one year of "the date on which [Darling] ceased Work on said Contract," unless (and insofar) such limitation were prohibited by controlling law.

Darling substantially completed the project by year's end 1983,[4] receiving all but $13,921 of the contract price. At that time, in IFI's words, "Darling declined to finish a punch list of items until he had

been paid for other additional items installed at Moose Lodge's request." This list itemized $58,250 in costs—an air handling system ($35,300), lift station ($14,750), and "utility changes" of carrier and sewer easement ($8,200). The Lodge refused to pay, and Darling did not finish the project. The parties dispute whether the Certificate of Occupancy issued by the city of Fairbanks in October 1983 (and a supplement certificate issued in November) signified completion of the project under the terms of the contract.

On January 30, 1984 the Lodge's attorney notified Darling by letter (with copy to IFI) that "numerous defects and failures in completion are substantially interfering with [the Lodge's] partial occupancy of the premises." The letter described defects in the new facility's insulation, hydrant, air and heat systems, and the absence of written mechanical plans, which a subcontractor had withheld for alleged nonpayment. Darling forwarded this letter to Corroon and Black, the agent through whom the bonds were purchased. Darling's response neither accepted nor denied liability; Darling obtained counsel, who suggested a meeting. On April 11, 1984 counsels' letters apparently crossed in the mail: Darling's attorney requested more specific information on unfinished items, while the Lodge's attorney, again with copy to IFI, noted the continued accrual of liquidated damages, the "passage of time and the absence of any response," and the "threat to life and safety" posed by a boiler· Darling had installed in an alleged unsafe and illegal manner. The Lodge formally declared Darling in default, and noticed its intent to "seek relief by permitting the surety to complete the project or [by] completing the pr[o]ject and advancing a claim for damages against the surety." This letter too was forwarded by Darling to Corroon and Black, and to IFI. Subsequently the Lodge renoted the boiler problem and

---

3. The bond defined "balance of the contract price" as the total amount payable less the amount "properly paid."

4. Darling apparently had requested and been granted an extension, with liquidated damages accruing. IFI does not contend that this extension, notice of which IFI expressly waived, affected its obligations under the bonds.

alleged other code violations, enclosing a copy of an engineer's report. By copy to IFI, the Lodge required the surety to "advise of its desire to either complete the contract or stand by the claim for damages to be incurred by the Lodge in securing performance."

Darling responded by requesting a specific punch list of items to be completed. Darling also provided correspondence and documentation to IFI's local agent, while noting that "it is not anticipated that the surety will become involved ... since Mr. Darling is certainly financially capable of completing the contract." IFI apparently contacted the Lodge May 1; the Lodge replied on May 17, citing numerous structural problems, code violations, known unpaid subcontractors, and imprecise amounts due each. The letter apparently attached notice from the City of Fairbanks Legal Department clarifying that a permanent certificate of occupancy had not been issued. The Lodge further provided a copy of the construction contract, adding that IFI "should note that there were no change orders of any kind issued at any time since the contract was signed." The Lodge indicated its intent to invite bids for completion.

On May 31, 1984 IFI noted that the apparent "stalemate" between the Lodge and Darling "requires communication," and encouraged settlement. IFI indicated its view that Darling "appears able to perform the work," and stated "it is unreasonable for the Moose Lodge to engage other contractors, which undoubtedly will cost more in the end." IFI authorized Moose Lodge to perform only such emergency work that Darling refused to perform. The same day, IFI noted in a letter to Darling that the Lodge attorney's letter of May 17 was "quite disturbing, particularly the indication that subcontractors and materialmen are owed in excess of $75,000." The surety "require[d] a detailed response from Darling," and expressed its doubt as to

Darling's prior assurance that the project could be completed without IFI's involvement.[5] IFI had received at least one subcontractor claim on the payment bond by this time.

On June 5, 1984 Moose Lodge notified IFI that the Lodge would complete the project. The Lodge renoted that Darling's default was evident and had been declared, and stated that IFI "may participate in order to reduce its costs and exposure or it may ignore the matter and answer under the bond in judicial proceedings." IFI responded June 26 by asserting to the Lodge IFI's right to complete any work, while prodding Darling "to discuss [with IFI] a means of minimizing the exposure, rather than simply await a lawsuit."

Darling obtained new counsel in July.[6] Through counsel, Darling offered to complete any unfinished work, deferring the question of compensation. The Moose Lodge apparently refused to allow Darling onto the premises. The Lodge and IFI then proceeded to debate the arbitration clause in the Moose–Darling contract, disagreeing on the rules, scope, and binding effect of the contemplated proceedings. The Lodge's letter of November 30, 1984 declared that IFI had "never acted upon its right to complete the project or to arrange for" its completion. The Lodge noted that the bond required suit, and "ask[ed] for a commitment as to whether the surety will participate in and be bound by the results of arbitration or will otherwise insist upon a court action." IFI offered to be bound by arbitration "conducted by the American Arbitration Association in accordance with its construction industry rules," which "must not consider any issues relating to the bond or any defenses available to the surety based upon the bond. In other words, the arbitration [would] be limited to issues between Darling Enterprises and the Moose Lodge." IFI would not participate. The Lodge rejected IFI's offer, stating that "[t]he Lodge wishes its rights determined

---

5. In IFI's words to Darling's attorney, "[i]t appears as though this option has been taken away from your client by its own inactivity.... I strongly suggest that quick action is needed on your client's part to salvage the situation."

6. Darling's new counsel apparently assumed dual representation of IFI until sometime after October 25, 1984.

in one action." Thereafter, IFI expressed its regret, asserted its "right to be in court," and advised the Lodge to "first find out whether you have a valid claim." IFI restated its willingness to be bound by arbitration limited to the construction contract dispute.

The superior court declined to compel the Lodge to arbitrate its claims against Darling, but dismissed the Lodge's claims against Darling without prejudice. IFI then moved for summary judgment on the Lodge's bad faith tort claim. In opposition, the Lodge sought summary judgment in its favor on this same claim. The superior court upheld IFI's claims of attorney-client privilege or work product immunity in regard to the Lodge's effort to discover whether IFI had set aside loss reserves for the Lodge's claim. The superior court then held that the Lodge had failed to allege bad-faith inaction by IFI in connection with the surety's obligations on the payment bond. Regarding the Lodge's allegation of bad faith arising from IFI's obligation as surety on the performance bond, the superior court held that

> [t]here is a legitimate dispute as to whether Darling was or was not in default and as to whether Moose Lodge was required to pay Darling for the claimed extras. Until such time as that dispute is resolved by arbitration as required in the contract, the failure of IFI to either complete the project or respond in damages is not required. [sic] If an act is not required, failure to do so or properly investigate is not bad faith. Therefore, the court concludes that there is no factual dispute and IFI is entitled to summary judgment on Moose Lodge's claim for bad faith. The cross-motion of Moose Lodge is therefore denied.

Thereafter the superior court denied the Lodge's Civil Rule 15 motion to amend its complaint to conform to the evidence. The superior court then granted IFI's motion to enter final judgment on the bad-faith claim under Civil Rule 54(b), and granted IFI attorney's fees in the amount of $80,000 on $134,192 claimed actual fees. This appeal followed.

## II. WHETHER THE LODGE STATED A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

IFI correctly notes that the initial question in this case is "Does Alaska recognize the tort of bad faith in the principal and surety context of a commercial construction claim?" IFI contends that "on the basis of this Court's precedents, as well as reason and policy, the answer to the question ... must be 'No.'" The Lodge responds that the tort claim of bad faith dealing is "alive and well in Alaska," citing *State Farm Fire & Casualty Co. v. Nicholson*, 777 P.2d 1152 (Alaska 1989), and that "[t]he only remaining question, then, is whether there is any persuasive reason to create an exception to the *Nicholson* rule and deny purchasers of construction bonds the protection which Alaska law provides to purchasers of other kinds of insurance contracts." We conclude that an implied covenant of good faith and fair dealing exists between a surety and its obligee on payment and performance bonds. This conclusion is based in part on *Nicholson* and in part upon the persuasive reasoning of the Supreme Court of Arizona in *Dodge v. Fidelity & Deposit Co. of Md.*, 161 Ariz. 344, 778 P.2d 1240, 1243 (1989).

In *Nicholson* the Nicholsons sued State Farm for breach of the insurer's duty to act in good faith, alleging that State Farm had not promptly settled a claim under the Nicholsons' homeowner's policy. State Farm argued that the tort of bad faith processing of insurance claims should be recognized only in the context of third-party liability claims and not in first-party cases when an insured seeks coverage for losses he or she incurred. *Nicholson*, 777 P.2d at 1154. We noted that "[t]he tort of bad faith in the insurance context can be traced to the covenant of good faith and fair dealing, a contractual duty implied in all insurance policies," *Id.* (citation omitted), and went on to hold that

> in the first-party context, an insured's cause of action against an insurer for breach of the duty of good faith and fair dealing sounds in tort. The special relationship between the insured and insurer

in the insurance context justifies this result.

*Id.* at 1156 (footnote omitted).[7]

In *Dodge v. Fidelity & Deposit Co. of Md.,* 161 Ariz. 344, 778 P.2d 1240, 1243 (1989) the Supreme Court of Arizona concluded that a surety has the duty to act in good faith in responding to its obligee's claims, and that a breach of that duty entitles the obligee to maintain a tort action against the surety. In reaching this holding the *Dodge* court stated in part:

> In *Noble v. National American Life Ins. Co.,* 128 Ariz. 188, 624 P.2d 866 (1981), we recognized as a *tort* an insurer's bad faith refusal to pay a valid claim submitted by its insured. We stated:
>
> > We have determined that it is reasonable to conclude that there is a legal

duty implied in an insurance contract that the insurance company must act in good faith in dealing with its insured on a claim, and a violation of that duty of good faith is a tort.

128 Ariz. at 190, 624 P.2d at 868.

Plaintiff's position is simple: sureties are insurers; insurers are subject to bad faith tort liability; therefore, sureties are subject to bad faith tort liability. The court of appeals rejected this syllogism as "too simplistic." *Dodge,* [*v. Fidelity Deposit Co. of Md.*], 161 Ariz. [340] at 341, 778 P.2d [1236] at 1237 [1986]. Although simple, this proposition is supported by our statutes, case law and sound policy reasons.

*Dodge,* 778 P.2d at 1241 (emphasis in original).[8]

---

7. In *Nicholson* we also noted that:

> In the past, we have declined to recognize a common-law tort duty of good faith and fair dealing in other contexts. For example, in *O.K. Lumber Co. v. Providence Washington Insurance Co.,* 759 P.2d 523 (Alaska 1988), an injured claimant sued a third-party tortfeasor's insurer for failure to promptly settle a claim. We declined to recognize a common-law tort duty of good faith and fair dealing running from an insurer to an injured claimant absent a contractual relationship. However, the decision in *O.K. Lumber* is not controlling in the instant appeal because there is a contractual relationship between State Farm and the Nicholsons: the Nicholsons are both the insureds and the injured claimants.

777 P.2d at 1156.

8. In *Dodge* the court further wrote:

> In *Noble* we noted that "[t]he whole purpose of insurance is defeated if an insurance company can refuse or fail, without justification, to pay a valid claim." 128 Ariz. at 190, 624 P.2d at 868. The same is true with construction performance bonds and other types of surety insurance. Permitting a surety to withhold performance of its obligations without reason would defeat the purpose for which surety insurance is intended.
>
> Similar policy considerations were determinative in *Suver v. Personal Service Ins. Co.,* 11 Ohio St.3d 6, 462 N.E.2d 415 (1984), in which the court held the issuer of a financial responsibility bond liable for its deliberate refusal to pay its obligations arising from the bond. Although admitting that "a financial responsibility bond is not the same as an insurance policy," the court concluded:
>
> These differences are not so pronounced as to require the creation of a cause of action in one case and its denial in the other. Precisely

the same policy arguments and rationale hold true in both settings. In both cases there is a great disparity of financial resources. Additionally, issuers of financial responsibility bonds are companies clearly affected with a public interest. Moreover, to insulate the issuer of a financial responsibility bond from liability for the deliberate refusal to pay its obligations arising from the bond is to encourage the routine denial of payment of claims for as long as possible. This court should not provide an incentive to act in bad faith.

. . . .

> So long as a surety acts reasonably in response to a claim made by its obligee, the surety does not risk bad faith tort liability. *Cf. Noble,* 128 Ariz. at 190, 624 P.2d at 868 ("The tort of bad faith arises when the insurance company intentionally denies, fails to process or pay a claim *without a reasonable basis for such action*") (emphasis added). As one commentator has written, noting the "appositional duties" of a surety:
>
> [T]he surety often finds it difficult to decide whether to accede to the demands of the claimant [obligee] or abide by the position desired by the principal. Notwithstanding this difficulty, the surety is in a position of having accepted a premium in exchange for its promise to pay or perform in case of specified events. . . . Additionally, it makes its promise with full knowledge that at times it will possibly be called upon to perform when it can do so only at some risk of losing its recovery rights against or inviting suits from its [principal]. Given the nature of a corporate surety's business, and its knowledge of the inherent risk it entails, it can have no real confidence that a "middle man" plea on its part . . . . will find a favorable reception

In our view the relationship of a surety to its obligee—an intended creditor third-party beneficiary—is more analogous to that of an insurer to its insured than to the relationship between an insurer and an incidental third-party beneficiary. *Compare Nicholson*, 777 P.2d at 1157 *with O.K. Lumber v. Providence Washington Ins. Co.*, 759 P.2d 523, 526 (Alaska 1988).[9] A surety may satisfy its duty of good faith to its obligee by acting reasonably in response to a claim by its obligee,[10] and by acting promptly to remedy or perform the principal's duties where default is clear.

## III. WHETHER THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO THE LODGE'S CLAIM OF BAD FAITH ON THE PART OF ITS SURETY IFI.

 "In reviewing the grant of a motion for summary judgment we are bound to take that view of the facts which most favors the appellant." *Drake v. Hosely*, 713 P.2d 1203, 1205 (Alaska 1986). The Lodge has adduced evidence that as early as January–February 1984, and no later than April of that year, IFI was aware of the Lodge's numerous and apparently supported claims that Darling had defaulted on the contract. The Lodge made a showing that IFI failed adequately to investigate the Lodge's claims, and that IFI failed

either to remedy Darling's evident default or to arrange for the completion of the contract consistent with its terms. In our opinion, the superior court therefore erred in granting summary judgment to IFI.[11] The superior court erred in deciding that no legitimate dispute existed as to the adequacy of IFI's investigation. Contrary to the court's reasoning,[12] failure by a surety minimally to investigate its principal's alleged default may constitute bad faith if that investigation would confirm the obligee's allegations in material part. In the case at bar, IFI has failed to adduce facts to defeat the Lodge's performance bond claims as a matter of law. IFI's abortive inquiries, and professed reliance without question upon its principal Darling's claims for additional compensation, do not merit summary judgment in IFI's behalf.[13]

 In our view the superior court further erred in entering summary judgment against the Lodge on the payment bond. A material dispute exists whether subcontractors submitted claims, whether those claims were sufficient under law and the terms of the bond, and whether *inter alia* the Lodge's complaint, correspondence, deposition instructions and answers to interrogatories were sufficient to put IFI on notice. *See* 5 Wright & Miller, *Federal Practice and Procedure* § 1215 at 108–13 (1969).[14]

---

with the court. Brumley, *Duty of a Shielded Surety to Investigate*, 17 Forum 266, 280 (1981).
*Dodge*, 778 P.2d at 1243–44.

**9.** *See* note 7 *supra.*

**10.** *See Dodge*, 778 P.2d at 1243; *cf. O.K. Lumber*, 759 P.2d at 525.

**11.** We further conclude, for the reasons expressed in this section, that the court did not err in denying the Lodge summary judgment on its bad faith tort claim.

**12.** As noted above, the superior court held in part that "[i]f an act is not required [pending arbitration], failure to do so or properly investigate is not bad faith."

**13.** Neither did the Lodge's letter of April 18, 1984, requiring the surety to "advise of its desire to either complete the contract or stand by the claim for damages to be incurred by the Lodge in securing performance," somehow waive IFI's

obligations under the performance (or payment) bond. Absent an order for specific performance, the surety is free not to act on claims by its obligee; the Lodge gave IFI nothing IFI did not already have.

**14.** In the alternative we hold that the superior court erred in denying the Lodge's motion to amend its complaint following the superior court's grant of summary judgment on the bad faith tort claim. IFI's opposition makes no persuasive argument that IFI stood to suffer substantial prejudice; neither was the delay undue, nor the amendment necessarily futile, in light of subcontractors' apparent potentially viable claims. *See Betz v. Chena Hot Springs Group*, 742 P.2d 1346, 1348–50 (Alaska 1987) (abuse of discretion to deny motion to amend antitrust claim in wake of summary judgment).

We also note our disagreement with the superior court's discovery ruling denying the Lodge discovery of the existence and amount of any loss reserves IFI may have established regarding the Moose Lodge claims. Discovery of the exist-

## IV. WHETHER THE SUPERIOR COURT ERRED IN REQUIRING THAT THE LODGE FIRST ARBITRATE ITS CONTRACT–BASED CLAIMS AGAINST IFI ARISING OUT OF THE PERFORMANCE BOND.

The Lodge argues that "the superior court erred in requiring arbitration of the Moose Lodge's breach of contract claim against [IFI]." We disagree. Contrary to the Lodge's assertion, the performance and payment bonds contain, each by express incorporation, the arbitration clause of the underlying construction contract.[15] Thus IFI may require the Lodge to determine at arbitration "all disputed questions of fact" relative to either Darling's or the Lodge's compliance with the terms of the construction contract.[16] Such arbitration, pursuant to and limited to the underlying contract, will bind the surety as well as the principal and beneficiary.[17]

The surety's demand for arbitration may not itself be made in bad faith, or serve to defeat an otherwise timely and sufficient

bad-faith claim. The proper judicial response is a stay of affected proceedings.[18] *Cf.* AS 09.43.020.

REVERSED.[19]

---

ence and character of such reserves appears reasonably calculated to lead to the discovery of admissible evidence. In reaching this conclusion we reject IFI's assertion of attorney-client privilege and the work product immunity doctrine. The existence and amount of any loss reserve is not a protected "confidential communication[ ] made for the purpose of facilitating the rendition of professional legal serivces." *See* Alaska R.Evid. 503(b). Neither is a loss reserve prepared in anticipation of litigation, *see, e.g., Baker v. CNA Ins. Co.,* 123 F.R.D. 322, 328 (D.Mont.1988) (citing *U.S. v. Davis,* 636 F.2d 1028 (5th Cir.1981)); rather, the reserve is established in the "ordinary course of business." *Langdon v. Champion,* 752 P.2d 999, 1006–07 (Alaska 1988) (citations omitted); *see* AS 21.18.-050.

**15.** *See, e.g., Exchange Mutual Insurance Co. v. Haskell Co.,* 742 F.2d 274, 276 (6th Cir.1984) (duty to arbitrate where performance bond on subcontract referenced arbitration clause in general contract).

**16.** *Compare J & S Construction Co., Inc. v. Travelers Indemnity Co.,* 520 F.2d 809, 810 (1st Cir. 1975) (subcontractor compelled to arbitrate claim against general contractor; "a contractual obligation to arbitrate cannot be rendered meaningless by the expedient of bringing suit on a statutory payment bond") (citation omitted) *with Murray E. Gildersleeve Logging Co. v.*

*Northern Timber Corp.,* 670 P.2d 372, 381 (Alaska 1983) (no contractual duty to arbitrate; obligee "has the option of suing the surety along with the principal"). Neither has IFI's participation in this litigation waived IFI's claim. The Lodge has suffered no prejudice thereby; nor is a demand for arbitration equivalent to the affirmative defense "arbitration and award" listed in Civil Rule 8(c).

**17.** *See, e.g., Fidelity and Deposit Co. of Maryland v. Parsons & Whittemore Contractors Corp.,* 48 N.Y.2d 127, 421 N.Y.S.2d 869, 872, 397 N.E.2d 380, 383 (Ct.App.1979) ("implicit corollary" of surety's acceptance of contractor and subcontractor's agreement to arbitrate "was agreement by the surety company that for purposes of later determining its liability under its performance bond, it would accept and be bound by the resolution reached in the arbitration forum").

**18.** We do not address the questions whether, in these circumstances, the surety may be compelled to participate in such arbitration proceedings, or whether the surety may participate over the objection of one or both parties to the underlying contract.

**19.** Of necessity the attorney's fees award is reversed. Our holdings make it unnecessary further to address any of the remaining issues which the parties have raised in this appeal.