**TRANSAMERICA PREMIER INSURANCE COMPANY, n/k/a TIG Premier Insurance Company, Petitioner,**

v.

**BRIGHTON SCHOOL DISTRICT 27J, a political subdivision of the State of Colorado, Respondent.**

No. 96SC227.

Supreme Court of Colorado, En Banc.

June 9, 1997.

Rehearing Denied Aug. 4, 1997.

---

Quiat, Schlueter, Mahoney & Ross, P.C., Laurin D. Quiat, Denver, for Petitioner.

Miller, DeLay & Crabb, P.C., Thomas S. Crabb, Pauline A. Brock, Westminster, for Respondent.

Chief Justice VOLLACK delivered the opinion of the court.

We granted certiorari to review the court of appeals decision in *Brighton School District 27J v. Transamerica Premier Insurance Co.*, 923 P.2d 328 (Colo.App.1996), to determine whether Colorado recognizes the existence of a common law tort claim against a commercial surety who fails to reasonably proceed with the payment of a claim under a performance bond. The court of appeals held that the trial court did not err in submitting an obligee's bad faith claim to the jury. We conclude that allowing this cause of action to proceed in the commercial surety context is justified by the special nature of the suretyship agreement and by the reasoning set forth in our prior decisions authorizing bad faith actions against insurers. For this reason, we affirm the court of appeals.

## I.

On May 13, 1991, Brighton School District 27J (the school district) entered into a contract with Adco Mechanical Contractors, Inc. (Adco) to perform the mechanical work on a construction project at Brighton High School. Pursuant to section 38–26–106(1), 16A C.R.S. (1982), Adco provided the school district with a performance bond on which Transamerica Premier Insurance Company (Transamerica) agreed to act as commercial surety to guarantee Adco's performance under its contract with the school district.[1]

---

1. Section 38–26–106(1) provides:

    *Every contractor who is awarded any contract for more than fifty thousand dollars for the construction, erection, repair, maintenance, or improvement of any building, road, bridge, viaduct, tunnel, excavation, or other public works for this state, or for any county, city and county, municipality, school district,* or other political subdivision of the state, before entering upon the performance of any such work included in said contract, shall duly execute, deliver to, and file with the board, officer, body, or person by whom such contract was awarded a good and sufficient bond, or other acceptable surety, approved by such contracting board, officer, body, or person, in a

Adco began work on the project in June of 1991 and soon fell behind schedule.[2] The construction manager and the school district repeatedly advised Adco of the need to proceed on schedule, but Adco fell further behind and continued to miss deadlines throughout the winter of 1991–92. Adco was also notified both orally and in writing that various problems with its work had been discovered, but it failed to address most of these problems. On April 30, 1992, solder, wood chips, and rocks were discovered in a unit ventilator which controlled the temperature in one of the classrooms. Further inspection revealed numerous instances of Adco's incomplete or defective work as well as repeated failures to comply with the architect's drawings and specifications. Following its investigation, the school district gave Adco written notice on May 19, 1992, that it had been removed from the project. That same day, the school district filed a claim with Transamerica on the performance bond. Adco filed suit on June 8, 1992, in Adams County District Court, alleging that the school district violated the terms of the construction contract.

The school district met with Transamerica representatives on June 10, 1992, to devise a remedial plan to correct the errors in Adco's work. At the meeting, the school district stressed the importance of completing the remedial project by the start of the 1992–93 school year. A Transamerica representative stated that the school district was proceeding properly and expressed Transamerica's desire to have the school district obtain between three and five bids for the remedial work.

On June 29, 1992, the school district filed an answer, counterclaim, and third-party complaint asserting breach of warranty, breach of contract, negligence, and fraud claims against Adco and asserting that Transamerica had breached the terms of the performance bond by not performing its commercial surety obligations.

Three bids for the remedial work were submitted by July 2, 1992, and the school district subsequently awarded the contract to a new contractor, APH Service Company (APH). On July 15, 1992, the school district sent a letter to Transamerica informing it that APH's bid had been selected and that the remedial work was proceeding on schedule. The next day, Transamerica responded to the school district's letter by stating that the remedial work concerned "nothing more than a detailed punchlist"; the new work contained several items that were not in Adco's original contract; the bids were "nonresponsive and extremely excessive"; and Adco should be returned to the project and allowed to complete the work. Thereafter, Transamerica made no progress payments for the remedial work and continued to assert that Adco had been wrongly terminated. Nevertheless, the remedial work was substantially completed by August 13, 1992. On January 15, 1993, a bill for the remedial work was sent to Transamerica and Adco. Three days later, the school district made a formal demand for payment which Transamerica refused. Adco subsequently declared bankruptcy.

The parties proceeded toward trial. On August 18, 1993, the school district was granted leave to amend its third-party claim against Transamerica to include a separate tort claim for bad faith denial of the school district's performance bond claim. On October 12, 1993, Transamerica filed a motion for summary judgment or dismissal of the third-party claim on grounds that the performance bond was not a contract for insurance that was subject to a bad faith claim. The trial court denied this motion and subsequent motions asserting the same argument. After an eleven-day trial, the jury awarded the school district $311,666.04 pursuant to the performance bond and an additional $10,000.00 on the school district's bad faith claim. The court of appeals held that the trial court did not err in submitting the school district's bad faith claim to the jury.

---

penal sum not less than one-half of the total amount payable by the terms of the contract. § 38–26–106(1), 16A C.R.S. (1982).

**2.** The construction contract between the school district and Adco provided that Adco's work was to be substantially completed by December 16, 1991.

## II.

In Colorado, every contract contains an implied duty of good faith and fair dealing. *See* § 4–1–203, 2 C.R.S. (1992); *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo.1995). Actions based upon a breach of this duty were traditionally limited to contract damages because the duty of good faith and fair dealing concerned the faithful performance of a contract's terms. *See Amoco Oil,* 908 P.2d at 498 (stating that "[t]he good faith performance doctrine is generally used to effectuate the intentions of the parties or to honor their reasonable expectations"). In *Farmers Group, Inc. v. Trimble,* 691 P.2d 1138 (Colo. 1984), we held that an insured could assert a cause of action apart from, and in addition to, contract damages for an insurer's breach of its implied duty to act in good faith. *Id.* at 1141–42. In so holding, we reasoned:

> The basis for liability in tort for the breach of an insurer's implied duty of good faith and fair dealing is grounded upon the special nature of the insurance contract and the relationship which exists between the insurer and the insured. The motivation of the insured when entering into an insurance contract differs from that of parties entering into an ordinary commercial contract. By obtaining insurance, an insured seeks to obtain some measure of financial security and protection against calamity, rather than to secure commercial advantage. The refusal of the insurer to pay valid claims without justification, however, defeats the expectations of the insured and the purpose of the insurance contract. It is therefore necessary to impose a legal duty upon the insurer to deal with its insured in good faith.

*Id.* at 1141 (citations omitted).

In *Travelers Insurance Co. v. Savio,* 706 P.2d 1258 (Colo.1985), we extended the "basic rationale" of *Trimble* to authorize actions in tort where an insurer was alleged to have handled a first-party workers' compensation claim in bad faith. *Id.* at 1272–76. We noted that, "[s]ince workers compensation serves the same purpose as insurance in general, the *Trimble* rationale demands that the provider of such compensation deal fairly and in good faith with an employee asserting

a compensable injury." *Id.* at 1273. We also elaborated on the proper standard for evaluating such claims as follows:

> [I]n the first-party context an insurer acts in bad faith in delaying the processing of or denying a valid claim when the insurer's conduct is unreasonable and the insurer knows that the conduct is unreasonable or recklessly disregards the fact that the conduct is unreasonable.

*Id.* at 1275.

Section 38–26–106(1), 16A C.R.S. (1982), provides that every contractor that is awarded a public works contract for more than $50,000 must submit a performance bond executed by a qualified commercial surety to the public entity in charge of the project. Under the terms of the performance bond, in the event the contractor (the principal) fails to fulfill its obligations to the public entity (the obligee) under the public works contract, the commercial surety must guarantee performance and/or satisfy debts resulting from unpaid labor and materials. *See* § 38–26–106(2), 16A C.R.S. (1982 & 1996 Supp.); *see also General Ins. Co. of America v. City of Colorado Springs,* 638 P.2d 752, 757 (Colo. 1981) (explaining that "[a] surety bond is a written contract guaranteeing performance of an obligation by another").

■ The issue in this case concerns whether we should extend our holdings in *Trimble* and *Savio* to include situations in which a commercial surety company fails to act in good faith when processing claims made by an obligee pursuant to the terms of a performance bond. We conclude that the rationale for providing insureds with a cause of action in tort for an insurer's bad faith in processing a claim applies with equal force in the commercial surety context.

We have previously explained that commercial sureties receiving consideration for the issuance of surety bonds serve a purpose similar to that of insurers:

> "Generally speaking, a contract of suretyship by a surety company is governed by the same rules as the contracts of other sureties, but some distinctions are made by the courts in construing such contracts. The doctrine that a surety is a favorite of

the law, and that a claim against him is *strictissimi juris,* does not apply where the bond or undertaking is executed upon a consideration[ ] by a corporation organized to make such bonds or undertakings for profit. While such corporations may call themselves 'surety companies,' their business is in all essential particulars that of insurers."

*Empire State Sur. Co. v. Lindenmeier,* 54 Colo. 497, 505, 131 P. 437, 440 (1913) (quoting 32 Cyclopedia of Law and Procedure *Principal and Surety* § 306 (1909) (footnotes omitted)).

The insurance statutes reflect a legislative intent to include sureties as part of the regulatory scheme governing insurance. Section 10–1–102(8), 4A C.R.S. (1994), defines the term "insurer" as "every person engaged as principal, indemnitor, surety, or contractor in the business of making contracts of insurance." Similarly, section 10–3–1102(2), 4A C.R.S. (1994), of the Deceptive Practices Statute, §§ 10–3–1101 to –1114, 4A C.R.S. (1994 & 1996 Supp.), defines the terms "insurance policy" and "insurance contract" to include suretyship agreements. The Deceptive Practices Statute expressly prohibits unfair claim settlement practices and lists a variety of penal measures available in the event a commercial surety engages in unfair settlement practices. *See* § 10–3–1104(h), 4A C.R.S. (1994); § 10–3–1108, 4A C.R.S. (1994). Furthermore, section 10–3–1113(1), 4A C.R.S. (1994), provides:

In any civil action for damages founded upon contract, or tort, or both against an insurance company, the trier of fact may be instructed that the insurer owes its insured the duty of good faith and fair dealing, which duty is breached if the insurer delays or denies payment without a reasonable basis for its delay or denial.

These statutes indicate persuasive legislative support for treating a commercial surety contract as a form of insurance agreement and for treating a commercial surety which fails to settle its obligations in good faith in the same way that our tort law treats insurers who process a claim in bad faith.

More specifically, most other jurisdictions that have considered this issue have recognized a separate cause of action in tort for a commercial surety's bad faith in processing claims made under a surety bond. *See Loyal Order of Moose, Lodge 1392 v. International Fidelity Ins. Co.,* 797 P.2d 622, 626–28 (Alaska 1990); *Dodge v. Fidelity and Deposit Co.,* 161 Ariz. 344, 346, 778 P.2d 1240, 1242 (1989); *K–W Indus. v. National Sur. Corp.,* 231 Mont. 461, 754 P.2d 502, 504–505 (1988); *Szarkowski v. Reliance Ins. Co.,* 404 N.W.2d 502, 504 (N.D.1987); *Suver v. Personal Serv. Ins. Co.,* 11 Ohio St.3d 6, 462 N.E.2d 415, 417 (1984). *But see Great American Ins. Co. v. North Austin Util. Dist.,* 908 S.W.2d 415, 418–20 (Tex.1995). We agree with the reasoning of those cases which authorize a bad faith cause of action in the commercial surety context and conclude that a similar result in the present case represents a logical extension of our holdings in *Trimble* and *Savio.*

■ A special relationship exists between a commercial surety and an obligee that is nearly identical to that involving an insurer and an insured. *See Loyal Order of Moose,* 797 P.2d at 626–27; *Suver,* 462 N.E.2d at 417; *see also Trimble,* 691 P.2d at 1141. When an obligee requests that a principal obtain a commercial surety bond to guarantee the principal's performance, the obligee is essentially insuring itself from the potentially catastrophic losses that would result in the event the principal defaults on its original obligation.[3] *See Dodge,* 778 P.2d at 1242. When the principal actually defaults, the commercial surety must assume or correct any flaws in performance pursuant to the terms of the original contract, thereby eliminating the obligee's risk of loss in the venture.

---

3. Contrary to Transamerica's assertions, public entities such as the school district seek performance bonds to reduce or eliminate the risk of catastrophic loss. *See Trimble,* 691 P.2d at 1141. Besides operating on a not-for-profit basis, public entities are constrained by tight budgets that give them little, if any, financial flexibility. Additionally, the timing of a contractor's performance is especially important in constructing schools. Delays and shoddy work on critical infrastructure improvement projects are sure to result in profound consequences to both the public entity and the general public that uses the facilities.

Although the parties to a suretyship agreement are on equal footing in terms of bargaining power when they enter into the agreement, it is the commercial surety who controls the ultimate decision of whether to pay claims made by the obligee under the terms of the surety bond. For this reason, the commercial surety has a distinct advantage over the obligee in its ability to control performance under the secondary agreement. As with insurers, commercial sureties must proceed with the payment of claims made pursuant to a surety bond in good faith. Otherwise, the core purpose of the suretyship agreement, which is to insulate the obligee from the risk of a default, is defeated. *See Trimble*, 691 P.2d at 1141; *Dodge*, 778 P.2d at 1243.

Recognizing a cause of action in tort for a commercial surety's breach of its duty to act in good faith compels commercial sureties to handle claims responsibly. When the commercial surety withholds payment of an obligee's claim in bad faith, contract damages do not compensate the obligee for the commercial surety's misconduct and have no deterrent effect to prevent such misconduct in the future. As the Arizona Supreme Court explained in *Dodge*, contract damages

"offer no motivation whatsoever for the insurer *not* to breach. If the only dam-

ages an insurer will have to pay upon a judgment of breach are the amounts that it would have owed under the policy plus interest, it has every interest in retaining the money, earning the higher rates of interest on the outside market, and hoping eventually to force the insured into a settlement for less than the policy amount."

*Id.* at 1242–43 (quoting *Wallis v. Superior Court*, 160 Cal.App.3d 1109, 207 Cal.Rptr. 123, 128 (1984)).

■ Transamerica argues that the unique features of suretyship distinguish it from insurance and that the suretyship agreement is, in essence, a financial service. We disagree.[4] As explained above, the suretyship agreement provides the obligee with financial security by eliminating the risk of default in the original agreement between the principal and the obligee. While there may be differences in the form of the suretyship agreement and the obligations of the parties, its substance is essentially the same as insurance. *See Empire State*, 54 Colo. at 505, 131 P. at 440.[5]

■ Accordingly, we hold that Colorado common law recognizes a cause of action in tort for a commercial surety's failure to act in good faith when processing claims made by an obligee pursuant to the terms of a

---

4. We recognize that the commercial surety is put in an awkward position in handling simultaneous claims made by the principal and the obligee. The Supreme Court of Hawaii has explained the surety's dilemma as follows:

> Clearly, the surety owes a duty of good faith and fair dealing to *both* the principal and the obligee on the bond. If the surety pays too quickly to the obligee, it may invite liability claims from the principal. Conversely, if it refuses to pay anything pending an arbitration or judicial proceeding to determine its liability on the bond, the surety may incur liability to the obligee for failing to act promptly on a valid claim.

*Board of Dirs. of Ass'n of Apartment Owners v. United Pac. Ins. Co.*, 77 Hawai'i 358, 884 P.2d 1134, 1137–38 (1994) (citations omitted). Although the commercial surety's obligations may be more complex than those of an insurer, this complexity does not authorize a commercial surety to disregard its obligation to act in good faith. *See Dodge*, 778 P.2d at 1243; *Suver*, 462 N.E.2d at 417.

5. In *Suver v. Personal Service Insurance Co.*, the Supreme Court of Ohio elaborated on the differ-

ences and similarities between insurers and sureties as follows:

> It is true that a financial responsibility bond is not the same as an insurance policy and that a surety is not an insurer and may therefore act in its own interest. But the nature of the differences between the two is neither complete nor absolute. Rather, the financial responsibility bond and the insurance policy differ primarily in whom they protect and to whom the duty runs....
>
> These differences are not so pronounced as to require the creation of a cause of action in one case and its denial in the other. Precisely the same policy arguments and rationale hold true in both settings.... Moreover, to insulate the issuer of a financial responsibility bond from liability for the deliberate refusal to pay its obligations arising from the bond is to encourage the routine denial of payment of claims for as long as possible. This court should not provide an incentive to act in bad faith.

*Suver*, 462 N.E.2d at 417 (citations omitted).

performance bond. In evaluating these causes of action, we adopt the rule set forth in *Savio* that a commercial surety acts in bad faith when the surety's conduct is unreasonable and the surety knows that the conduct is unreasonable or recklessly disregards the fact that its conduct is unreasonable. *Savio*, 706 P.2d at 1275.[6] By imposing this legal duty on the commercial surety, our holding ensures that the expectations of the obligee and the purposes of the suretyship agreement are given effect while recognizing the surety's right to refuse invalid claims. *See id.* at 1274–75; *see also Trimble*, 691 P.2d at 1141; *Dodge*, 778 P.2d at 1242–43.

### III.

The trial court properly submitted the school district's bad faith claim to the jury and gave the jury an appropriate instruction on the applicable standard. Therefore, we affirm the decision of the court of appeals.

KOURLIS, J., dissents, and MARTINEZ, J., joins in the dissent.

Justice KOURLIS dissenting:

The majority recognizes a common law cause of action in tort for a commercial surety's failure to act in good faith when processing claims made by an obligee pursuant to the terms of a performance bond. *See* maj. op. at 353. In support of that result, the majority concludes that "the rationale for providing insureds with a cause of action in tort for an insurer's bad faith in processing a claim applies with equal force in the commercial surety context." *Id.* at 351. Because I believe that there are essential differences between the surety/obligee relationship and the insurer/insured relationship, I would decline to recognize a bad faith claim in this case. Therefore, I respectfully dissent.

"Colorado, like the majority of jurisdictions, recognizes that every contract contains an implied duty of good faith and fair dealing. § 4–1–203, 2 C.R.S. (1992)." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo.1995). However, breach of the duty of good faith does not automatically create tort liability. Rather, in most commercial contracts, breach of the implied duty gives rise to standard contract remedies. *See Wheeler v. Reese*, 835 P.2d 572, 578 (Colo.App.1992).

We have held that insurance contracts are different from commercial contracts, such that an insurer's breach of the contractual duty of good faith and fair dealing can form the basis for a separate cause of action sounding in tort. *See Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1273–74 (Colo.1985); *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138, 1141 (Colo.1984). "The basis for liability in tort for the breach of an insurer's implied duty of good faith and fair dealing is grounded upon the special nature of the insurance contract and the relationship which exists between the insurer and the insured." *Trimble*, 691 P.2d at 1141.

We have predicated the existence of a special relationship upon various factors, including quasi-fiduciary obligations, protection against unforeseeable loss, and unequal bargaining power. In my view, none of those factors exist in the suretyship context. Specifically, Transamerica did not have a quasi-fiduciary obligation to the school district; Transamerica was not insuring the school district against an unforeseeable calamity, but rather against a completely foreseeable possibility; and the school district was not hampered by an unequal bargaining position, but could have contracted for whatever remedies it felt were necessary to protect against possible loss. Therefore, the elements of a special relationship are not present.

---

**6.** In *Savio*, we noted that injured workers could be viewed as third-party beneficiaries of an insurance contract between the insurer and the employer. *Id.* at 1272. We further explained that the relationship between the employee asserting the workers' compensation claim and the insurance company was essentially that of a first-party claim. *Id.* Similarly, the obligee in a suretyship agreement is analogous to a third-party beneficiary because the suretyship agree-

ment, in this case a performance bond, is designed solely for the obligee's benefit. *See Loyal Order of Moose, Lodge 1392 v. International Fidelity Ins. Co.*, 797 P.2d 622, 628 (Alaska 1990) (explaining that an obligee in a suretyship agreement is an "intended creditor third-party beneficiary"). We therefore view a claim filed by an obligee under a suretyship agreement as a first-party claim that warrants application of the *Savio* standard. *See Savio*, 706 P.2d at 1274–75.

Additionally, I disagree with the extension of the remedy because it does not provide a clear stopping point. For example, although the majority limits its opinion to commercial sureties, the reasoning could extend to guarantors and bondsmen who also provide financial security by assuring payment in the event of a party's default on an agreement, thereby subjecting those guarantors or bondsmen to the possibility of a bad faith tort cause of action in addition to their contractual liabilities for failure to perform their obligations.

For those reasons, I would limit the school district to the remedies provided by the contract.

## A.

The majority asserts that "[a] special relationship exists between a commercial surety and an obligee that is nearly identical to that involving an insurer and an insured." Maj. op. at 352. However, in my view, several of the key elements which make the relationship between insurer and insured "special" are absent from the surety/obligee relationship.

First, unlike the relationship between an insurer and an insured, a relationship between a surety and obligee is not quasi-fiduciary. When an insurance company handles claims of third persons against its insured, the insurance company stands in a position similar to that of a fiduciary because the "insurer retains the absolute right to control the defense of actions brought against the insured, and the insured is therefore precluded from interfering with the investigation and negotiation for settlement." See *Trimble*, 691 P.2d at 1141. In *Trimble*, we quoted the following language from the Supreme Court of Wisconsin:

> [W]here a person purchases an insurance policy, "[he barters] to the insurance company *all of the rights possessed by him to discover the extent of the injury and to protect himself as best he can from the consequences of the injury.* He has contracted with the insurer that it shall have the exclusive right to settle or compromise the claim, to conduct the defense, and that he will not interfere except at his own cost

and expense." *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 688, 271 N.W.2d 368, 375 (1978) (quoting *Hilker v. Western Automobile Ins. Co.*, 204 Wis. 1, 14, 235 N.W. 413, 414 (1931)).

*Id.* (emphasis supplied).

Because the insurer retains these valuable rights, it is obligated to act reasonably in denying or delaying payment of a claim. *See id.* at 1142. By contrast, a surety is in no way responsible for third party claims against an obligee. The obligee does not cede any right to represent his interests to the surety by virtue of the suretyship agreement and retains the rights to pursue, defend, settle, or compromise claims with the principal, surety, or third parties. As the majority recognizes, the surety has obligations both to the obligee and to the principal. *See* maj. op. at 353 n. 4. Those obligations are defined by the contract of suretyship, and are not of a fiduciary nature. Therefore, to the extent our holding in *Trimble* was based upon the existence of a quasi-fiduciary relationship arising from the insured's surrender of rights to the insurer, that holding does not support the majority's result.

When an obligee files an action against a surety for bad faith failure to pay a claim on a performance bond, the situation is more analogous to a first-party direct coverage case. *See Savio*, 706 P.2d at 1274 (first-party direct coverage case arises where party claims for himself benefits he is entitled to under the terms of an insurance contract). The rationale for the creation of a tort for bad faith breach of insurance contract in a first-party direct coverage case is the concern that a contract claim for insurance proceeds may not effectively protect an injured party once a calamity has befallen him or her. *See id.* at 1273. In support of this rationale, in *Savio*, we quoted the following language from the Supreme Court of Rhode Island:

> [I]nsurers, backed by sufficient financial resources, are encouraged to delay payment of claims to their insureds with an eye toward settling for a lesser amount than that due under the policy.... The

inequity of this situation becomes particularly apparent in the area of disability insurance in which the insured, often pursued by creditors and devoid of bargaining power, may easily be persuaded to settle for an amount substantially lower than that provided for in the insurance contract. *Bibeault v. Hanover Insurance Co.*, 417 A.2d 313, 318 (R.I.1980).

*Id.*

The majority contends that this same concern arises in the suretyship context because "it is the commercial surety who controls the ultimate decision of whether to pay claims made by the obligee under the terms of the surety bond. For this reason, the commercial surety has a distinct advantage over the obligee in its ability to control performance under the secondary agreement." Maj. op. at 353.

The concern that a surety may take advantage of a bond obligee in the claims resolution process overlooks fundamental differences between liability insurance contracts and surety bonds. *See Great American Ins. Co. v. North Austin Mun. Util. Dist.*, 908 S.W.2d 415, 418 (Tex.1995). In contrast with a liability insurance contract, which involves only the insurer and insured, "suretyship involves a tripartite relationship between a surety, its principal, and the bond obligee, in which the obligation of the surety is intended to supplement an obligation of the principal owed to the bond obligee." *Id.* at 418. The surety's obligation to the bond obligee is secondary to the obligation owed by the surety's principal to that obligee. *See id.* at 418–19. Thus, in contrast with a party sustaining a loss covered under a liability insurance contract who can look only to an insurer for recovery, a bond obligee has a remedy against the principal. *See id.* at 419. For this reason, an obligee is not necessarily left in the same vulnerable position that an insured may face in the wake of a calamity.

## B.

The foreseeability of the loss is another distinction between suretyship and insurance.

Insurance by its very nature protects against unforeseen losses. In contrast, a surety bond secures to the obligee the cost necessary to complete a project. Before the suretyship agreement is entered into, the obligee is aware of the losses that may result if the principal breaches the contract. The obligee is also aware of any damages that may result from the surety's breach of the suretyship agreement. "Generally, the measure of damages for a breach of contract is the loss in value to the injured party of the other party's performance caused by its failure or deficiency, plus any other incidental or consequential loss caused by the breach, less any cost or other loss that the injured party has avoided by not having to perform. *Restatement (Second) of Contracts*, § 347 (1981)." *General Ins. Co. of America v. City of Colorado Springs*, 638 P.2d 752, 759 (Colo.1981).[1] The damages that may result from the surety's breach are reasonably foreseeable, unlike the situation in which calamity strikes and leaves an insured party without the means to face the demands of his or her creditors.

The majority argues that by requiring the principal to obtain a surety bond, the obligee is "essentially insuring itself from the potentially catastrophic losses that would result in the event the principal defaults on its original obligation." Maj. op. at 352. The fact that losses resulting from a breach of contract may be catastrophic does not make them any less foreseeable. The majority recognizes that "the parties to a suretyship agreement are on equal footing in terms of bargaining power when they enter into the agreement." Maj. op. at 353. Because the loss is foreseeable, the obligee has the opportunity to bargain for provisions protecting against that loss, unlike an insured who is generally required to accept an insurance contract on a "take it or leave it" basis. *See Great American Ins. Co. v. General Builders, Inc.*, 934 P.2d 257, 263 (Nev.1997) (refusing to allow obligee's bad faith tort action against surety because there was no "special relationship" where parties had equal bargaining power

---

1. The non-breaching party cannot recover for all consequential losses, but rather only those "consequential losses which are the natural, probable, and reasonably foreseeable consequence of a party's failure to perform his contract." *DSCO, Inc. v. Warren*, 829 P.2d 438, 442 (Colo.App.1991).

and contractual damages were sufficient to make obligee "whole"). The inclusion of a bad faith claim in the remedies available against a surety will likely mean that all individuals contracting for a surety bond will be required to pay some additional amount for the tort coverage, whether they want that coverage or not.

## C.

The fact that the General Assembly treats sureties similarly to insurers in some contexts should not thereby subject sureties to bad faith liability.

The definition of insurer contained in section 10–1–102(8), 4A C.R.S. (1994), includes "every person engaged as principal, indemnitor, surety, or contractor in the business of making contracts of insurance." In addition, section 10–3–1102(2), 4A C.R.S. (1994), defines the terms "insurance policy" and "insurance contract" to include suretyship agreements. These statutes group insurers and sureties together because both enter into contracts to pay a benefit upon a determinable risk contingency, and, hence, both can be similarly regulated. However, it is not the fact that an insurer contracts to pay a benefit upon the occurrence of a particular event that justifies the creation of a tort action for bad faith breach. Rather, in the context of a third-party claim, it is the quasi-fiduciary relationship, and in the context of a first-party claim it is the injured party's vulnerability following an unforeseen calamity and the unequal bargaining power between insurer and insured. Those circumstances are not present in this case.

## D.

I view a tort cause of action for bad faith breach of the insurance agreement as a narrow exception to the general rule that breach of contract does not give rise to tort liability.[2] This exception is justified by the special relationship between insurer and insured. Fundamental elements of this relationship are missing from the relationship between surety and obligee. Therefore, I would decline to extend bad faith tort liability to sureties. For this reason, I respectfully dissent.

I am authorized to say that Justice MARTINEZ joins in this dissent.

**2.** The reasoning adopted by the majority in this case may potentially expand this exception far beyond the context of commercial sureties. The majority concludes that the suretyship agreement is indistinguishable from insurance because it "provides the obligee with financial security by eliminating the risk of default in the original agreement between the principal and the obligee." Maj. op. at 353. According to this rationale, a bad faith tort claim may arise from the breach of any contract in which one party agrees to compensate the other upon the occurrence of an identified risk or loss. This would extend potential tort liability for breach of contract to agreements entered into by guarantors and bondsmen, and possibly beyond. For example, the Supreme Court of Alabama applied reasoning similar to that relied upon by the majority to a case in which a car owner brought an action against a service provider based on the provider's alleged bad faith refusal to pay a claim under a new car mechanical failure service contract. *See Schoepflin v. Tender Loving Care Corp.*, 631 So.2d 909 (Ala.1993). The court concluded that the contract was "insurance" for purposes of a bad faith claim because the service provider, for compensation, assumed the risk that the owner's automobile would sustain a mechanical breakdown and promised to pay for the cost of repairs if a breakdown did occur. *Id.* at 911.