25CA1145 Parental Resp Conc CLR 02-19-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1145
Weld County District Court No. 23DR894
Honorable Kimberly B. Schutt, Judge

---

In re the Parental Responsibilities Concerning C.L.R., a Child,

and Concerning Luiz Fernando Rodrigues,

Appellant,

and

Flaviane Landroni Lobo Do Prado,

Appellee.

---

JUDGMENT AFFIRMED IN PART, APPEAL DISMISSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE LUM
J. Jones and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 19, 2026

---

Luiz Fernando Rodrigues, Pro Se

Harwich Brickey, LLC, Kara M. Harwich, Fort Collins, Colorado, for Appellee

¶ 1    Luiz Fernando Rodrigues (father) appeals the district court's judgment allocating parental responsibilities for C.L.R. (the child) to Flaviane Landroni Lobo Do Prado (mother).  Father also untimely appeals, for the second time, the permanent protection order issued against him in 2023.

¶ 2    We dismiss the portion of the appeal concerning the permanent protection order.  We affirm the judgment and remand to the district court to determine mother's appellate attorney fees and costs.

## I.    Relevant Facts

¶ 3    The child was born in July 2022, and the parents separated nearly a year later.  Mother later sought and was granted a temporary civil protection order against father.  The parties stipulated to dismiss the protection order and to have no contact with each other, outside of that about the child, and the court granted the stipulation.

¶ 4    At the same time, father petitioned for an allocation of parental responsibilities (APR), and the parties agreed to a temporary parenting time schedule providing that mother would

supervise father's visits.[1]  The parties also filed a temporary parenting time stipulation, but it was never made an order of the court.

¶ 5     About three weeks after filing their temporary parenting time stipulation, mother filed an emergency motion to restrict father's parenting time and a complaint for a temporary protection order against father.  Mother alleged that, after the no-contact agreement had been entered, father refused to leave her home until several hours after his parenting time ended and, two days later, came to her home and demanded entry.  She called the police and locked herself and the child in a bathroom.  The district court granted the motion to restrict and entered the temporary protection order. Then, after a hearing in August 2023, the court credited mother's allegations, granted mother a permanent protection order (PPO), and ordered that father's parenting time be supervised at Lutheran Family Services.  Father exercised no parenting time during the rest of the case.

---

[1] On mother's request to change venue, the underlying case was moved from Jefferson County to Weld County, where mother resided with the child.

¶ 6      After a full-day permanent orders hearing, the court entered a detailed, written ruling regarding the APR.  The court continued the restriction on father's parenting time, allocating him one hour of supervised parenting time each week.  In addition, the court drew an adverse inference about father's income due to his repeated failure to comply with mandatory financial disclosures, imputed him with an income of $6,791.67 per month, and ordered him to pay monthly and retroactive child support.  The court also ordered that father pay $30,000 of mother's attorney fees under § 13-17-102, C.R.S. 2025, and § 14-10-119, C.R.S. 2025.

## II.    Father's Opening Brief

¶ 7      Mother requests that we dismiss father's appeal for failure to comply with C.A.R. 28.  We agree that father's opening brief does not comply with this rule.  Father fails to state the applicable standards of review, whether issues were preserved, and, if so, "the precise location[s] in the record where" any issues were raised and "where the court ruled."  *See* C.A.R. 28(a)(7)(A).  He also rarely cites any authorities or the parts of the record he references.  *See* C.A.R. 28(a)(7)(B).  While father represents himself, he must

"comply with procedural rules to the same extent as parties represented by attorneys." *Adams v. Sagee*, 2017 COA 133, ¶ 10.

¶ 8 We would be within our discretion to dismiss father's appeal, but we opt to address his arguments to the extent that we can discern them. *See Harris v. Reg'l Transp. Dist.*, 155 P.3d 583, 586-87 (Colo. App. 2006) (appellate court has discretion in determining whether to sanction pro se party who failed to comply with appellate rules). However, we will not comb the record for facts supporting father's arguments that aren't cited in his brief. *See Cikraji v. Snowberger*, 2015 COA 66, ¶ 10; *see also Brighton Sch. Dist. 27J v. Transamerica Premier Ins. Co.*, 923 P.2d 328, 335 (Colo. App. 1996) ("[I]t is not the duty of the reviewing court to search the record for evidence to support bald assertions."), *aff'd*, 940 P.2d 348 (Colo. 1997). And we warn father that if he fails to comply with the appellate rules in the future, he may face sanctions, including dismissal of any appeal. *See* C.A.R. 38(a).

### III.   PPO

¶ 9 The PPO was entered in August 2023. Father filed a post-trial motion requesting relief from that judgment, which was denied. Father then filed untimely appeal of the court's denial of his post-

trial motion, which was dismissed with prejudice. *See In re Parental Responsibilities Concerning C.L.R.*, (Colo. App. No. 24CA0770, June 3, 2024) (unpublished order); C.A.R. 4(a)(1); *In re Marriage of James*, 2023 COA 51, ¶ 8 ("The timely filing of a notice of appeal is a jurisdictional prerequisite for appellate review."); *see also In re Marriage of Wiggs*, 2025 COA 10, ¶ 24 (holding a PPO issued in an ongoing dissolution case is a final, appealable order).

¶ 10    Despite that, he now appeals the PPO, claiming that the district court erroneously entered it for numerous reasons. Because his appeal is untimely, we dismiss it with prejudice for lack of jurisdiction. *See James*, ¶ 8.

## IV.    Due Process

¶ 11    Father argues that the district court denied him due process because it didn't permit him to call witnesses or present evidence at the permanent orders hearing. We aren't persuaded.

¶ 12    Due process requires a party to be provided with a meaningful opportunity to be heard. *See In re Marriage of Hatton*, 160 P.3d 326, 329 (Colo. App. 2007). However, a party generally may not obtain relief on a due process claim absent a showing of harm or prejudice. *See People in Interest of J.A.S.*, 160 P.3d 257, 262 (Colo.

App. 2007); *see also In re Marriage of Dauwe*, 148 P.3d 282, 286 (Colo. App. 2006) (due process right to a full and fair hearing was not violated where party failed to show any prejudice in connection with the district court's quashing of a subpoena for one of his witnesses).

¶ 13　Father doesn't identify the witness testimony and other evidence the court excluded, nor how his case was harmed by his inability to present that evidence at the hearing. Because he fails to show how the court's alleged error prejudiced him, we reject his argument. *See id.*

## V.　Supervised Parenting Time

¶ 14　Father asserts that the court erred by continuing the restriction on his parenting time in its permanent orders. He says that the court didn't make any finding that he was "unfit, abusive, or present[ed] any risk to the child" necessitating the restriction. We again are unpersuaded.

¶ 15　A district court has broad discretion over parenting time matters, and we exercise every presumption in favor of upholding its decision. *See In re Parental Responsibilities Concerning S.Z.S.*, 2022 COA 105, ¶ 13. A court abuses its discretion when its

6

decision is manifestly arbitrary, unreasonable, or unfair, or is based on a misapplication of the law. *In re Marriage of Evans*, 2021 COA 141, ¶ 25.

¶ 16    A court must allocate parenting time in accordance with the child's best interests, giving paramount consideration to the child's safety and physical, mental, and emotional conditions and needs. § 14-10-124(1.5)(a), C.R.S. 2025. A court cannot restrict parenting time unless it "finds, after a hearing, that parenting time by the party would endanger the child's physical health or significantly impair the child's emotional development." *Id.* In addition to finding endangerment, when a court continues a restriction, it must "enumerate the specific factual findings supporting the restriction." *Id.*

¶ 17    Here, the child was nearly three years old when the court entered permanent orders. The court allocated father — who had not seen the child since she was a year old — supervised visits of one hour per week to build a bond with her. And it ordered that

father may have two supervised visits per week after at least ten consistent visits.[2]

¶ 18     In support of the ongoing restriction, the court determined that (1) supervised parenting time continued to be in the child's best interests and "necessary for her safety" and (2) "[u]nsupervised time would most certainly be endangering to" her. *See id.* Thus, contrary to father's assertion, the court made the required endangerment findings when it determined that supervised parenting time was necessary for the child's safety.

¶ 19     In doing so, the court credited mother's testimony about father's past conduct, including (1) calling mother names such as "demon" or "bitch"; (2) threatening to kill mother's dog; (3) making threats against mother or threats of self-harm when mother didn't give in to requests to continue their relationship and allow him access to the child; and (4) suggesting the child would up in an orphanage. The court also noted, with record support, that father had repeatedly called and messaged mother and violated the PPO.

---

[2] Due to father's "stated refusal to participate in supervised parenting time," the court did not order any further phased parenting time for him but did outline conditions father must demonstrate before it would consider lifting the restriction.

¶ 20　The court found that father's conduct fell "squarely in the definition of domestic abuse" and stated its concern about the "traumatic effect on the child from exposure to [such] conduct being directed against" mother. The court indicated it was also concerned that father would "use the child as a means of manipulation, control or harm to [m]other, including potentially leaving the country with the child, without [m]other's consent." And it had "very little confidence that [f]ather would follow *any* parenting time conditions" put in place to ensure the child's safety. (Emphasis added.)

¶ 21　To the extent father asserts otherwise, the evidence at the permanent orders hearing amply supports the court's findings. The child's maternal grandmother testified that she was "always concerned" about the child because of father's "explosive nature." Mother testified that father was "very controlling," that his "biggest threats were about custody," and that she was "very scared that he was going to take [the child] away." She also described father's conduct that led her to obtain PPO and about the communications she received from him after the PPO was in place. The determination of what constitutes endangerment is highly

9

individualized, and we will not disturb findings on this issue when, as here, the record supports them. *See In re Marriage of Wenciker*, 2022 COA 74, ¶ 26.

¶ 22 Nor do we agree with father's assertion that the restriction is a "de facto termination" of his parental rights because, as he asserts, he cannot afford the supervising facility's fee. Father objected to his parenting time being supervised in his testimony and insisted that a supervised visit was "never going to happen." And the court found that he had "purposefully chosen not to see the child in one and a half years" following the restriction due to parenting time "not being offered on his terms."[3]

¶ 23 In any event, the APR did not amount to a termination because father was granted parenting time and retained parental responsibilities. *See L.L. v. People*, 10 P.3d 1271, 1277 (Colo. 2000) (concluding that a guardianship order was not the functional equivalent of a termination of parental rights).[4]

---

[3] In an earlier order, the court also noted that, to the extent cost was a barrier to exercising supervised parenting time, father could "follow the policies of Lutheran Family Services to request a reduced supervision fee."

[4] We do not further address father's vague and undeveloped claims that a "cumulative effect" of the rulings he challenges, or varying

¶ 24     Accordingly, we discern no error in the court's parenting time allocation.  *See Evans*, ¶ 25.

## VI.   Child Support

¶ 25     Father also asserts that the district court abused its discretion by ignoring his financial circumstances and ordering him to pay an unaffordable and "excessive" amount of child support, including retroactive support.  We are not convinced.

¶ 26     We review a court's child support orders for an abuse of discretion.  *In re Marriage of Schaefer*, 2022 COA 112, ¶ 8.  In doing so, we will not disturb the court's factual findings unless they are clearly erroneous and unsupported by the record.  *Id.*

¶ 27     In calculating child support, the court must consider the parties' financial resources, including each parent's income.  *See* § 14-10-115(2)(b)(II), (V), C.R.S. 2025.  "Income" for child support purposes means a parent's actual gross income from any

---

combinations of them, "de facto terminat[e]" or otherwise violate his constitutional rights.  *See People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004) (declining to address an appellate argument presented without supporting facts, specific argument, or specific supporting authorities).

source.  § 14-10-115(5)(a)(I); *In re Marriage of Davis*, 252 P.3d 530, 534 (Colo. App. 2011).

¶ 28     Father testified at the permanent orders hearing that he was a flooring installer and that he owned his own company.  Father said, however, that his company was bankrupt and that he was nearly "broke," explaining that his expenses exceeded his annual income of roughly $70,000.

¶ 29     Contrary to his claim that the court ignored his financial circumstances, the court heard his claims of financial hardship but didn't find them credible.  *See In re Marriage of Amich*, 192 P.3d 422, 424 (Colo. App. 2007) ("The [district] court can believe all, part, or none of a witness's testimony . . . .").

¶ 30     Further, we see no abuse of the court's discretion in its imputation of father's income to $81,500 annually.  Based on father "repeatedly refus[ing] to comply with the Court's order for disclosure of financial documents," the court drew an adverse inference that he was concealing income.  *See In re Marriage of Sgarlatti*, 801 P.2d 18, 19 (Colo. App. 1990) (the district court could draw the inference that a party's refusal to make a willing disclosure of his financial status meant he was concealing income).

¶ 31    Father's and his business's bank statements, subpoenaed by mother and admitted at the hearing, showed deposits of nearly $150,000 over forty weeks.  As those statements did not account for his take-home pay, the court took judicial notice of the average wages of flooring installers (from the United States Bureau of Labor Statistics), recognizing that the top ten percent of earners made over $81,500.[5]  Based on this, the bank statements, and other evidence, the court imputed father's annual income consistent with this figure.

¶ 32    We will not disturb the court's finding concerning father's income based on the evidence available to it.  *See Schaefer*, ¶ 8; *see also In re Marriage of Yates*, 148 P.3d 304, 311 (Colo. App. 2006) (upholding an order imputing income based on the only evidence available when the party's financial disclosures were "atrocious").  Nor will we reweigh the evidence.  *See In re Marriage of Thorburn*, 2022 COA 80, ¶ 49 (the weight, probative force, and sufficiency of the evidence, and the inferences and conclusions drawn therefrom, are matters within the sole discretion of the district court).

---

[5] Father doesn't contend that the court erred by taking judicial notice of these figures.

¶ 33    We are also not convinced that the support order was excessive.  Based on father's imputed income and mother's annual income of roughly $40,000, and after an upward deviation of less than two dollars from the guidelines, the court calculated a monthly obligation of $825.  And it ordered that father pay roughly $16,000 in retroactive child support over twenty-four months because of his failure to voluntarily pay any child support during the pendency of the case.  *See* § 14-10-115(2)(a).

¶ 34    Father makes other conclusory allegations of error, including that the court ignored the guidelines and "due process requirements" and that the support order was "punitive."  But because he fails to develop any remaining claims, we decline to address them.  *See People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004).  Moreover, father — who does not direct us to where in the record he preserved any of his arguments — seemingly makes all these claims for the first time on appeal.  *See Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 2012 CO 61, ¶ 18 ("[I]ssues not raised in or decided by a lower court will not be addressed for the first time on appeal."); *see also McGihon v. Cave,*

2016 COA 78, ¶ 16 (an appellate court does not consider constitutional issues raised for the first time on appeal).

¶ 35   Thus, the court's child support order was not an abuse of its discretion. *See Schaefer*, ¶ 8.

## VII.   Attorney Fees in the District Court

¶ 36   Father next asserts that the court erred by ordering that he pay $30,000 of mother's attorney fees, an amount "grossly disproportionate to his financial ability," and without a "finding of bad faith or litigation misconduct." We are not convinced.

¶ 37   The court found that, as of three months before it issued permanent orders, mother incurred roughly $33,400 in attorney fees. While noting it would typically apportion a greater sum of the fees to mother, the court allocated father $30,000 of her fees to avoid "further proceedings and opportunities for [f]ather to perpetuate his abusive court filings through a determination of additional fees incurred by [m]other in the last three months." The court in turn ordered that mother was responsible for the balance of her attorney fees.

¶ 38   Despite father's assertion, the court indeed determined that (1) his conduct was substantially groundless, substantially frivolous,

or substantially vexatious and (2) father, while pro se, clearly knew or reasonably should have known that his actions were without substantial justification. *See* § 13-17-102(4), (6), C.R.S. 2025; *In re Marriage of Tognoni*, 313 P.3d 655, 661 (Colo. App. 2011).

¶ 39 Moreover, the court found, with record support, that father expanded the scope of the proceedings by "repeatedly fil[ing] motions and other pleadings, including a premature appeal," and through his "willful failure" to provide mandatory disclosures. And the court found, also with record support, that despite its clear orders, deadline reminders, and father's access to information for pro se litigants, he "repeatedly failed to follow" its directions.

¶ 40 The court also concluded that this fee allocation was appropriate under section 14-10-119, C.R.S. 2025. Under this statute, the court may apportion attorney fees equitably between parties based on their relative ability to pay. *In re Marriage of Boettcher*, 2018 COA 34, ¶ 34, *aff'd*, 2019 CO 81. The court found that mother's financial circumstances had been "severely . . . hindered by the prolonged litigation" father caused and by his failure to pay any child support. And given their incomes, it determined that father was in a better financial position

than mother.  To the extent father asks to reweigh the evidence surrounding his finances, we will not do so.  *See Thorburn*, ¶ 49.

¶ 41   Further, we do not address father's conclusory claim that the attorney fees order penalized him "for exercising his right to seek custody."  *See D.B-J.*, 89 P.3d at 531.

¶ 42   Thus, we discern no abuse of discretion in the court's well-supported award of attorney fees.  *See Tognoni*, 313 P.3d at 661; *Yates*, 148 P.3d at 315.

## VIII.  Remaining Contentions

¶ 43   Father also argues that the court (1) was biased against him; (2) failed to make findings supported by evidence; and (3) erroneously imputed income to him without a required finding that he was voluntarily underemployed.  However, we do not address these arguments because father makes or develops them for the first time in his reply brief.  *See In re Marriage of Dean*, 2017 COA 51, ¶ 31.  Nor will we address any other issues that he references in his briefs but does not sufficiently develop for our review.  *See id.*; *D.B-J.*, 89 P.3d at 531.

## IX.  Appellate Attorney Fees and Costs

¶ 44    Relying on C.A.R. 38 and 39, section 13-17-102, and section 14-10-119, mother seeks her appellate attorney fees and costs. Under section 13-17-102, she argues that father's appeal is frivolous and "another attempt at abusive court filings."

¶ 45    An appeal may be frivolous as filed or as argued.  *Calvert v. Mayberry*, 2019 CO 23, ¶ 45.  An appeal is frivolous as filed when there is "no legitimately appealable issue[]."  *Id.*  It is frivolous as argued when the appellant "fail[s] to set forth . . . a coherent assertion of error, supported by legal authority."  *Id.* (quoting *Castillo v. Koppes-Conway*, 148 P.3d 289, 292 (Colo. App. 2006)).

¶ 46    We conclude that the portion of father's appeal concerning the PPO is frivolous as filed.  There is no legitimately appealable issue in connection with the PPO because father is time-barred from contesting it on appeal.  *See id.*  Further, mother moved to dismiss father's first appeal because it was untimely, father responded, and a motions division of this court granted mother's motion.  Because the first appeal concerned an order entered *after* the PPO, father clearly knew or reasonably should have known that he was time-barred from raising arguments about the PPO in this appeal and,

thus, that his PPO arguments are substantially frivolous. *See* § 13-17-102(6) (a self-represented party should not be assessed attorney fees unless the court finds that the party clearly knew or reasonably should have known that the party's action or any part of it was substantially frivolous, groundless, or vexatious). Accordingly, we award mother her reasonable attorney fees for defending this part of the appeal. We exercise our discretion under C.A.R. 39.1 to remand to the district court to determine the amount of the award.

¶ 47 We do not award fees under section 13-17-102 in connection with the remainder of the appeal. As discussed, father failed to follow C.A.R. 28 and asserted numerous conclusory and undeveloped allegations of error. However, even if we assumed that the remainder of the appeal, or some portion of it, lacked substantial justification, we are not convinced that father clearly knew or reasonably should have known that was the case. *See* § 13-17-102(6); *see also Boettcher*, ¶ 38 ("Fees should be awarded only in clear and unequivocal cases . . . .").

¶ 48 Mother also requests attorney fees under section 14-10-119, based on the parties' disparate financial circumstances. Because the district court is better positioned to determine the parties'

current relative financial circumstances, we remand her request to the district court. *See* C.A.R. 39.1; *In re Marriage of Alvis*, 2019 COA 97, ¶ 30.

¶ 49 Lastly, we award mother her costs in connection with C.A.R. 39(a)(1) and (2).

## X. Disposition

¶ 50 The portion of the appeal concerning the PPO is dismissed. The permanent orders judgment is affirmed. The case is remanded to district court for further proceedings regarding (1) the amount of mother's reasonable appellate attorney fees with respect to the PPO portion of the appeal under section 13-17-102; (2) whether to award mother appellate attorney fees under section 14-10-119; and (3) the amount of mother's appellate costs under C.A.R. 39.

JUDGE J. JONES and JUDGE MEIRINK concur.